**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 17 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

     Plaintiff-Appellant,

v.

SAMUEL FRANCIS PATANE,

     Defendant-Appellee.

No. 01-1503

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 01-CR-228-WM)**

---

Joseph C. Wyderko, Attorney, Criminal Division, U.S. Department of Justice, Washington, D.C. (John W. Suthers, United States Attorney; Suneeta Hazra and Sean Connelly, Assistant United States Attorneys, Denver, Colorado, with him on the briefs), for Plaintiff-Appellant.

Jill M. Wichlens, Assistant Federal Public Defender (Michael G. Katz, Federal Public Defender, with her on the brief), Denver, Colorado, for Defendant-Appellee.

---

Before **EBEL**, **ANDERSON**, and **HENRY**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

The Government appeals from the district court's order suppressing the physical evidence against Samuel Francis Patane on charges of gun possession by a felon. The district court based its suppression order on its conclusion that the evidence was insufficient to establish probable cause to arrest Patane. We conclude, contrary to the district court, that probable cause existed to arrest Patane. However, we affirm the district court's order on the alternative ground that the evidence must be suppressed as the physical fruit of a <u>Miranda</u> violation.

## I. BACKGROUND

Patane was indicted for possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). The district court held a suppression hearing at which the police investigation leading to discovery of the gun was detailed. Ruling from the bench a week later, the court granted defendant's motion to suppress. Patane's arrest resulted from the intersection of two essentially independent investigations – one by Colorado Springs Detective Josh Benner regarding Patane's gun possession, and another by Colorado Springs Officer Tracy Fox regarding Patane's violation of a domestic violence restraining order.

The story begins when Patane was arrested for harassing and menacing his ex-girlfriend, Linda O'Donnell. He was released on bond from the El Paso, Colorado county jail on June 3, 2001, subject to a temporary restraining order.

The restraining order is not in the record, but uncontroverted testimony indicates that it forbade Patane to contact O'Donnell, in person or by phone, directly or indirectly, in the 72 hours after his release on bond.

On June 6, an agent with the federal Bureau of Alcohol, Tobacco, and Firearms telephoned Detective Benner, a member of a local police drug interdiction unit that worked closely with the ATF. The agent said that a county probation officer had told him that Patane was a convicted felon who also had been convicted on a domestic violence charge, and that Patane possessed a Glock .40 caliber pistol. The record does not reveal how the probation officer knew that Patane had the gun. Detective Benner called O'Donnell to inquire about the gun, and she told him that Patane had the pistol with him at all times.

Seemingly by coincidence, at the moment Benner called O'Donnell to ask about the gun, Officer Fox had arrived at O'Donnell's residence, responding to a call from O'Donnell about an alleged violation of the restraining order. O'Donnell told Officer Fox that two days earlier, O'Donnell received a hang-up call. Using the *69 feature on her telephone, O'Donnell learned that the call originated from a number that O'Donnell recognized as Patane's home telephone. This call violated Patane's restraining order, O'Donnell stated, and she showed Officer Fox a copy of the order. O'Donnell said that she was afraid for her safety, that she knew Patane regularly had a gun, and that Patane kept a list of

people he wanted to kill. Officer Fox confirmed by computer that a restraining order had been issued.

Officer Fox did not confirm O'Donnell's use of the call tracing, although she had done so in a prior, unrelated case and thus was aware it was possible. Neither Officer Fox nor Detective Benner ran a criminal background check on O'Donnell prior to Patane's arrest, which Patane asserts would have revealed that O'Donnell was herself out on bond for carrying a concealed weapon, criminal trespass, theft, and criminal damage.

Detective Benner and Officer Fox then spoke by phone. Officer Fox said she planned to arrest Patane for violating the restraining order by calling O'Donnell, and the two arranged to go to Patane's house. Officer Fox knocked on the door while Detective Benner went out back in case Patane attempted to flee. The woman who answered the door summoned Patane. Officer Fox asked Patane to step outside, which he did. She asked him about the hang-up call, and Patane denied having made the call or having contacted O'Donnell in any way. Officer Fox told Patane that he was under arrest and handcuffed him shortly afterward.

With Patane arrested and handcuffed, Detective Benner emerged from the back of the house and approached Patane. Detective Benner began advising Patane of his <u>Miranda</u> rights, but only got as far as the right to silence when

- 4 -

Patane said that he knew his rights. No further <u>Miranda</u> warnings were given, a fact which the Government concedes on appeal resulted in a <u>Miranda</u> violation. Detective Benner told Patane he was interested in what guns Patane owned. Patane replied, "That .357 is already in police custody." Detective Benner said, "I am more interested in the Glock." Patane said he was not sure he should tell Detective Benner about the Glock pistol because he did not want it taken away. Detective Benner said he needed to know about it, and Patane said, "The Glock is in my bedroom on a shelf, on the wooden shelf." Detective Benner asked for permission to get the gun, which Patane granted, and Detective Benner went inside, found the gun where Patane described, and seized it. Detective Benner then told Patane, as the detective later testified, that "I wasn't going to arrest him for the gun at this time because I wanted to do some more investigations." Officer Fox took Patane to the police station and booked him for violating the restraining order.

The next day, Detective Benner met with Patane's probation officer and verified that Patane had a prior felony conviction for drug possession as well as a misdemeanor third degree assault conviction.

## II. PROBABLE CAUSE

On appeal, the Government argues that the district court erred in concluding that the police lacked probable cause to arrest Patane for violating the domestic violence restraining order. We agree with the Government.

In reviewing the district court's probable cause determination, "we consider the evidence in a light most favorable to the district court's legal determinations, and review the court's findings of historical fact for clear error. Absent any finding of fact, we will uphold the court's legal determination if any reasonable view of the evidence supports it. We review the ultimate determinations of reasonable suspicion to stop and probable cause to arrest de novo." United States v. Treto-Haro, 287 F.3d 1000, 1002 (10th Cir. 2002) (citations omitted). We have articulated the substantive probable cause standard as follows:

> An officer has probable cause to arrest if, under the totality of the circumstances, he learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested. Probable cause does not require facts sufficient for a finding of guilt; however, it does require more than mere suspicion.

United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001) (internal quotation marks and citations omitted).

The district court's ruling that no probable cause existed to arrest Patane for violating the domestic violence restraining order was based on its view that

domestic disputes often involve "claims and counterclaims . . . thrown between people who have separated some sort of an intimate relationship," and therefore that uncorroborated allegations arising from such disputes are "just inadequate" to establish probable cause. Unexplored avenues of corroboration noted by the court were: the failure to check telephone records to confirm O'Donnell's allegation that a call had been placed from Patane's residence to hers during the time frame covered by the restraining order, "verification which presumably could have been done rather easily," the failure to investigate O'Donnell's credibility prior to the arrest, the failure to corroborate O'Donnell's accusations apart from Detective Benner's confirmation that Patane indeed possessed a gun, which "has nothing to do with the crime for which he was arrested," and the failure to determine whether persons other than Patane had access to Patane's telephone. The court also noted that "[i]t's just one contact which . . . could, in my life experience, have been an innocent mistake" because "people do make calls to numbers with which they are familiar, not intending to make the call," that Patane denied having contacted O'Donnell, and that O'Donnell delayed two days in reporting the call to the police.

We reject any suggestion that victims of domestic violence are unreliable witnesses whose testimony cannot establish probable cause absent independent corroboration. We have stated, "when examining informant evidence used to

support a claim of probable cause for a . . . warrantless arrest, the skepticism and careful scrutiny usually found in cases involving informants, sometimes anonymous, from the criminal milieu, is appropriately relaxed if the informant is an identified victim or ordinary citizen witness." Easton v. City of Boulder, 776 F.2d 1441, 1449 (10th Cir. 1985); see also Guzell v. Hiller, 223 F.3d 518, 519-20 (7th Cir. 2000) ("Police are entitled to base an arrest on a citizen complaint . . . of a victim . . . without investigating the truthfulness of the complaint, unless . . . they have reason to believe it's fishy." (citations omitted)). See generally 2 Wayne R. LaFave, Search and Seizure § 3.4(a), at 209-11 (3d ed. 1996) (noting that "[b]y far the prevailing view" is that corroboration is not essential in victim-witness cases, and arguing "that when an average citizen tenders information to the police, the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that such may not be the case").

We find no basis for the suggestion that domestic violence victims are undeserving of the presumption of veracity accorded other victim-witnesses. Indeed, our decision in Easton forecloses such a position. In Easton, probable cause to arrest for child molestation was based on the accusations of two child witnesses, one five years old and the other three years old. We rejected as "an

entirely unacceptable point of view" the argument that the children's testimony

was suspect, stating:

> In a great many child molestation cases, the only available
> evidence that a crime has been committed is the testimony of
> children. To discount such testimony from the outset would
> only serve to discourage children and parents from reporting
> molestation incidents and to unjustly insulate the perpetrator of
> such crimes from prosecution.

Easton, 776 F.2d at 1449.[1] A strict corroboration requirement in domestic

violence cases would create precisely the same proof problems we found

dispositive in Easton.

In this case, neither the district court nor Patane point to any evidence in

the record suggesting that O'Donnell lied about the purported hang-up call out of

personal animosity against Patane arising from their failed relationship, let alone

that the police were aware of such evidence at the time of arrest. For example,

there was no evidence that O'Donnell had threatened to lie in such a manner, or

that she had lied in such a manner in the past. To the contrary, there was

evidence that Patane recently had been arrested for harassing and menacing

O'Donnell after he threatened to kill her, that O'Donnell knew that Patane carried

---

[1] We noted in Easton that the accusations of the children contained
"significant" discrepancies, and even noted the possibility that their testimony
would be inadmissible in court due to an inability to understand the oath, yet we
held that the children's accusations established probable cause. 776 F.2d at 1449-
50.

a gun and kept a list of persons (including police officers) he wanted to kill, and that O'Donnell feared that Patane would kill her. Admittedly, O'Donnell waited two days before reporting the hang-up call, a fact that could cast some doubt on the veracity of her report. However, we do not believe that fact alone was sufficient to require the officers to treat her complaint with special skepticism.

In any event, we note that the officers here did corroborate O'Donnell's veracity in two respects. First, the district court found as fact that, prior to the arrest, Detective Benner had learned from a probation officer that Patane possessed a gun. Second, Officer Fox verified that a restraining order had been issued against Patane. The mere fact that further corroboration was possible is not dispositive of whether the information available would lead a reasonable person to believe that an offense had been committed.

At oral argument, Patane argued that, as a matter of law, a single hang-up phone call could not constitute a violation of the restraining order. We disagree. As noted above, the evidence showed that the restraining order forbade Patane to contact O'Donnell, directly or indirectly, in person or by telephone, and counsel for Patane conceded that multiple hang-up phone calls would amount to a violation of the restraining order. We find no basis to conclude that a single call is not "contact" with the victim, or that a single call does not implicate the same concerns about intimidation and harassment that multiple calls would. Cf. 42

U.S.C. § 376hh(a), (b)(1) ("encourag[ing] States . . . to treat domestic violence as a serious violation of criminal law" by authorizing Attorney General to make grants to implement "mandatory arrest or proarrest programs and . . . policies for protection order violations").  We acknowledge that it is conceivable that a single hang-up call might result from careless rather than willful behavior.  However, probable cause does not require certainty of guilt or even a preponderance of evidence of guilt, but rather only reasonably trustworthy information that would lead a reasonable person to believe an offense was committed.  Morris, 247 F.3d at 1088.  The possibility that the hang-up call here was accidental does not defeat probable cause.

Accordingly, we conclude that Patane's arrest was supported by probable cause to believe that Patane had violated the domestic violence restraining order.[2]

---

[2]  In light of our conclusion that the officers had probable cause to arrest for violation of the restraining order, it is unnecessary to reach the Government's alternative argument that the arrest was justified by probable cause to believe that Patane was a felon in possession of a gun.  The district court declined to decide whether the officers had probable cause to arrest on the basis of Patane's gun violation.  ("[T]o allow the arresting officers after the fact to go back and scramble . . . for evidence that might justify an arrest on another charge . . . would not be a good rule to establish . . . .").)  On appeal, the Government argued that this reasoning is foreclosed by United States v. Santana-Garcia, 264 F.3d 1188, 1192-93 (10th Cir. 2001) (officer's subjective belief as to non-existence of probable cause not dispositive); see also Treto-Haro, 287 F.3d at 1006 (same).  Patane correctly conceded that the district court's reasoning was erroneous in light of our precedent, and on appeal he argued only that the officers lacked probable cause to believe that he was a felon in possession of a gun.  The district

(continued...)

## III. SUPPRESSION OF THE PHYSICAL FRUITS OF A *MIRANDA* VIOLATION

Our conclusion that the district court erroneously based suppression of the gun on the absence of probable cause to arrest does not end our inquiry. Patane argues that suppression of the gun should be affirmed because, even if the arrest was proper, the ensuing Miranda violation independently requires suppression of the physical evidence.

The district held, and the Government concedes on appeal, that a Miranda violation occurred when the police questioned Patane about his possession of a gun without administering the complete Miranda warnings. As explained above, this questioning led Patane to admit that he possessed a gun in his bedroom, which admission in turn led immediately to seizure of the gun. The Government correctly concedes that Patane's admissions in response to questioning were inadmissible under Miranda, but argues that the physical fruit of the Miranda violation – the gun – is admissible.

The district court determined that it was unnecessary to decide whether the physical fruits of a Miranda violation must be suppressed because it had concluded that the underlying arrest that led to the confession was

---

[2](...continued)
court did not reach this issue, and we decline to do so in the first instance on appeal.

unconstitutional. Because we have reversed the conclusion that the arrest was unconstitutional, we are now squarely presented with the issue whether the gun should be suppressed in any event because it was obtained as the fruits of an unconstitutionally obtained confession. This issue was fully briefed and presented below and it is again fully briefed on appeal. Resolution of this issue involves our answering a purely legal question (i.e., whether the physical fruits of a Miranda violation must be suppressed), a question that potentially would render remand and further proceedings unnecessary. Thus, we now turn to that issue. Smith v. Plati, 258 F.3d 1167, 1174 (10th Cir. 2001). Below, we conclude that the physical evidence that was the fruit of the Miranda violation in this case must be suppressed.

A. Supreme Court precedent

The Government relies primarily on two Supreme Court cases for its argument that the fruits doctrine does not apply to Miranda violations: Michigan v. Tucker, 417 U.S. 433, 445-46 (1974), and Oregon v. Elstad, 470 U.S. 298, 306 (1985). Both cases, it is true, declined to apply the fruits of the poisonous tree doctrine of Wong Sun v. United States, 371 U.S. 471, 485 (1963), to suppress evidence obtained from an un-Mirandized confession. However, both cases were predicated upon the premise that the Miranda rule was a prophylactic rule, rather

than a constitutional rule. Elstad, 470 U.S. at 305 ("'The prophylactic Miranda warnings are not themselves rights protected by the Constitution . . . .'" (quoting New York v. Quarles, 467 U.S. 649, 654 (1984)) (internal quotation marks omitted)); id. at 308 ("Since there was no actual infringement of the suspect's constitutional rights, [Tucker] was not controlled by the doctrine expressed in Wong Sun that fruits of a constitutional violation must be suppressed." (emphasis added)); Tucker, 417 U.S. at 445-46 (distinguishing Wong Sun because "the police conduct at issue here did not abridge respondent's constitutional privilege against compulsory self-incrimination, but departed only from the prophylactic standards later laid down by this Court in Miranda to safeguard that privilege"). Because Wong Sun requires suppression only of the fruits of unconstitutional conduct, the violation of a prophylactic rule did not require the same remedy.

However, the premise upon which Tucker and Elstad relied was fundamentally altered in Dickerson v. United States, 530 U.S. 428 (2000). In Dickerson, the Supreme Court declared that Miranda articulated a constitutional rule rather than merely a prophylactic one. Id. at 444 ("Miranda announced a constitutional rule that Congress may not supersede legislatively."); see id. at 432, 438, 440. Thus, Dickerson undermined the logic underlying Tucker and Elstad.

- 14 -

Additionally, a close reading of <u>Tucker</u> and <u>Elstad</u> reveals other distinctions that lead us to conclude that those cases should not be given the sweeping reading the Government is asserting. We examine each decision below.

<u>Tucker</u> involved an un-<u>Mirandized</u> custodial interrogation that occurred prior to the issuance of the <u>Miranda</u> decision.[3] During the course of the interrogation, the defendant identified a relevant witness of whom the police previously had been ignorant. The defendant argued before the Court that the testimony of the witness so identified by the defendant should have been barred as the fruit of the <u>Miranda</u> violation. The Court's rejection of this argument rested largely on its conclusion that excluding the fruits of this confession would have minimal prophylactic effect because the officers were acting in complete good faith under prevailing pre-<u>Miranda</u> law that barred only coerced confessions. After noting in the opening paragraph of the opinion that the interrogation took place prior to <u>Miranda</u>, <u>Tucker</u>, 417 U.S. at 435, the Court explained:

> The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. . . . Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force.

---

[3]  <u>Miranda</u> nonetheless applied because it was issued prior to Tucker's trial. In fact, the defendant received all the warnings later incorporated into the Miranda requirements except for the advice that he could receive free counsel if he was indigent.

> We consider it significant to our decision in this case that the officers' failure to advise respondent of his right to appointed counsel occurred prior to the decision in <u>Miranda</u>. <u>Although we have been urged to resolve the broad question of whether evidence derived from statements taken in violation of the Miranda rules must be excluded regardless of when the interrogation took place, we instead place our holding on a narrower ground.</u> For at the time respondent was questioned these police officers were guided, quite rightly, by the principles established in <u>Escobedo v. Illinois</u> . . . .

<u>Id.</u> at 447 (emphasis added, footnote omitted). The Court then noted that no coercion rendered the challenged testimony unreliable. <u>Id.</u> at 449.

The other Supreme Court case offered by the Government to support its argument is <u>Elstad</u>, 470 U.S. at 306. In <u>Elstad</u>, the defendant made incriminating statements while in custodial interrogation prior to the issuance of <u>Miranda</u> warnings. The police then administered <u>Miranda</u> warnings, and thereafter the defendant made further incriminating statements. The issue in <u>Elstad</u> was whether the defendants post-<u>Mirandized</u> statements must be suppressed as the fruit of the earlier <u>Miranda</u> violation. <u>Id.</u> at 303. The Supreme Court held that suppression was not required, rejecting the view that the post-warning statements were the unconstitutional product of "a subtle form of lingering compulsion, the psychological impact of the suspect's conviction that he has let the cat out of the bag." <u>Id.</u> at 311. After repeating the now-suspect reasoning that a <u>Miranda</u> violation was not necessarily a constitutional violation and thus not controlled by the fruits doctrine of <u>Wong Sun</u>, the Court stated:

- 16 -

> [T]he <u>Miranda</u> presumption, though irrebuttable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted.
>
> . . . .
>
> . . . . In deciding how sweeping the judicially imposed consequences of a failure to administer <u>Miranda</u> warnings should be, the <u>Tucker</u> Court noted that neither the general goal of deterring improper police conduct nor the Fifth Amendment goal of assuring trustworthy evidence would be served by suppression of the witness' testimony. The unwarned confession must, of course, be suppressed, but the Court ruled that introduction of the third-party witness' testimony did not violate Tucker's Fifth Amendment rights.
>
> We believe that this reasoning applies with equal force when the alleged "fruit" of a noncoercive <u>Miranda</u> violation is neither a witness nor an article of evidence but the accused's own voluntary testimony. As in <u>Tucker</u>, the absence of any coercion or improper tactics undercuts the twin rationales–trustworthiness and deterrence–for a broader rule. Once warned, the suspect is free to exercise his own volition in deciding whether or not to make a statement to the authorities. The Court has often noted: <u>A living witness is not to be mechanically equated with the proffer of inanimate evidentiary objects illegally seized.</u> The living witness is an individual human personality whose attributes of will, perception, memory and <u>volition</u> interact to determine what testimony he will give.

<u>Id.</u> at 307-09 (first emphasis added, alterations and internal quotation marks omitted). <u>Elstad</u> thus drew a distinction between fruits consisting of a subsequent confession by the defendant after having been fully Mirandized and fruits consisting of subsequently obtained "inanimate evidentiary objects." <u>Id.</u> at 309. A subsequent, Mirandized confession need not be excluded because it is the product of "<u>volition</u>," willingly offered up by a defendant who already had been

- 17 -

made aware of his <u>Miranda</u> rights.  <u>Id.</u>  By implication, "inanimate evidentiary objects" would be excludable, because physical evidence derived from the defendant's un-Mirandized statement is not the product of volition after a defendant has been Mirandized properly.[4]  <u>See id.</u> at 347 n.29 (Brennan, J., dissenting) ("[T]oday's opinion surely ought not be read as also foreclosing application of the traditional derivative-evidence presumption to physical evidence obtained as a proximate result of a <u>Miranda</u> violation.  The Court relies

_____

[4]  <u>See also</u> <u>Orozco v. Texas</u>, 394 U.S. 324 (1969).  In <u>Orozco</u>, the officers interrogated a suspect in custody without giving <u>Miranda</u> warnings, learning that the suspect owned a gun and where it was located.  <u>Id.</u> at 325.  Ballistics tests of the gun indicated that it had been used to commit a murder.  <u>Id.</u>  In a terse holding, the Court held that "<u>the use</u> of these admissions obtained in the absence of the required warnings was a flat violation of the Self-Incrimination Clause of the Fifth Amendment as construed in <u>Miranda</u>."  <u>Id.</u> at 326 (emphasis added).  The Court did not expressly consider whether the gun and the ballistics evidence would be admissible on remand.  However, one plausible reading of <u>Orozco</u> is that the reference to the unconstitutional "use" of the statements includes their use by police officers in obtaining the gun, as well as their introduction of the admission at trial.

This reading of <u>Orozco</u> is reinforced by the Court's subsequent opinion in <u>Kastigar v. United States</u>, 406 U.S. 441 (1972).  <u>Kastigar</u> noted that the privilege against self-incrimination "protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used," <u>id.</u> at 445, and that "immunity from use and derivative use is coextensive with the scope of the privilege," <u>id.</u> at 453.

Indeed, in <u>Miranda</u> itself the Court stated that "unless and until such warnings and waiver are demonstrated by the prosecution at trial, <u>no evidence obtained as a result of interrogation</u> can be used against him."  384 U.S. 436, 454 (1966) (emphasis added).

heavily on individual 'volition' as an insulating factor in successive-confession cases. . . . [This] factor is altogether missing in the context of inanimate evidence." (citation omitted)).[5]

While the reasoning regarding volition in Elstad's holding indicates that the physical fruits of a Miranda violation are subject to the Wong Sun fruits doctrine, we acknowledge that dicta elsewhere in the opinion has been cited for the contrary conclusion. See Elstad, 470 U.S. at 307 ("[T]he Miranda presumption, though irrebuttable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted."); id. at 308 (stating that Tucker's reasoning "applies with equal force when the alleged 'fruit' of a noncoercive Miranda violation is neither a witness nor an article of evidence but the accused's own voluntary testimony").[6] These passages,

_____

[5] There is a substantial argument that Elstad ought not even be treated as a case involving application of the Wong Sun fruits doctrine in the first place, for precisely the reasons emphasized by Elstad in its volition discussion. In rejecting the argument that the second confession was the result of some "subtle form of lingering compulsion," id. at 311, Elstad in effect concluded that the second confession was not evidence "obtained . . . as a direct result" of the Miranda violation. Wong Sun, 371 U.S. at 485. In other words, the post-Mirandized confession in Elstad was admitted because it was not (rather than despite the fact that it was) the fruit of the poisonous tree.

[6] We also recognize that Justice O'Connor argued that the physical fruits of a Miranda violation were not subject to Wong Sun suppression in her pre-Elstad concurrence in New York v. Quarles, 467 U.S. 649, 665-72 (1984) (O'Connor, J., concurring in the judgment in part and dissenting in part). As explained above, this argument was not adopted by the Court in Elstad or in any

(continued...)

in contrast to the volition discussion, provide only ambiguous support for the position for which they are cited. To the extent they do address the admissibility of the physical fruits of a <u>Miranda</u> violation rather than a subsequent Mirandized confession, they are dicta not part of the reasoning of the holding.

In any event, we do not suggest that the holding in <u>Elstad</u> relying on volition definitively establishes that the physical fruits of a <u>Miranda</u> violation must be suppressed. Rather, the essential point for our analysis is only that <u>Elstad</u> does not definitively establish the contrary rule. We think Justice White most accurately summarized the relevance of <u>Elstad</u> and <u>Tucker</u> to the issue of suppression of the physical fruits of a <u>Miranda</u> violation:

> In <u>Michigan v. Tucker</u>, this Court expressly left open the question of the admissibility of physical evidence obtained as a result of an interrogation conducted contrary to the rules set forth in <u>Miranda v. Arizona</u>. Since that time, the state and federal courts have been divided on this question. Indeed, in <u>Massachusetts v. White</u>, 439 U.S. 280 (1978), this Court was evenly divided on the issue of the admissibility of physical evidence obtained from an interrogation that violated <u>Miranda</u>.
> . . . .
> While <u>Elstad</u> has been considered illuminating by some Courts of Appeals on the question of admissibility of physical evidence yielded from a <u>Miranda</u> violation, that decision did not squarely address the question presented here, and in fact, left the matter open.

_____

[6](...continued)
subsequent opinion of the Court. Justice O'Connor joined the majority opinion in <u>Dickerson</u>.

- 20 -

Patterson v. United States, 485 U.S. 922, 922-23 (1988) (White, J., dissenting from denial of certiorari) (footnotes and citations omitted).

It is true that, prior to Dickerson, the Tenth Circuit applied Tucker and Elstad to the physical fruits of a Miranda violation and concluded that suppression was not required because "[w]here the uncounseled statement is voluntary . . . there is no fifth amendment violation and the fruits may be admissible." United States v. McCurdy, 40 F.3d 1111, 1117 (10th Cir. 1994) (internal quotations omitted). However, once again Dickerson has undercut the premise upon which that application of Elstad and Tucker was based because Dickerson now concludes that an un-Mirandized statement, even if voluntary, is a Fifth Amendment violation. Dickerson, 530 U.S. at 444.

Accordingly, we reject the Government's position that Tucker and Elstad foreclose suppression of the physical fruits of a Miranda violation.


B. Lower court approaches

Courts applying Dickerson have split on the proper application of Wong Sun to the physical fruits of a Miranda violation. The Third and Fourth Circuits have ruled that the physical fruits of a Miranda violation never are subject to Wong Sun suppression. United States v. Sterling, 283 F.3d 216, 218-19 (4th Cir. 2002), cert. denied, 122 S. Ct. 2606 (2002); United States v. DeSumma, 272 F.3d

176, 180-81 (3d Cir. 2001), cert. denied, 122 S. Ct. 1631 (2002); accord United States v. Newton, 181 F. Supp. 2d 157, 179-81 & n.16 (E.D.N.Y. 2002); Taylor v. State, 553 S.E.2d 598, 605 (Ga. 2001); State v. Walton, 41 S.W.3d 75, 88-90 (Tenn. 2001); cf. Abraham v. Kansas, 211 F. Supp. 2d 1308, 1323 (D. Kan. July 2002) (holding that "[a]lthough the Court's holding in Dickerson seems to have altered this general rule [that fruits of a Miranda violation need not be suppressed]," the state court's failure to suppress physical fruits was not an "unreasonable application of federal law" under 28 U.S.C. § 2254(d)(1)); Worden v. McLemore, 200 F. Supp. 2d 746, 752-53 (E.D. Mich. 2002) (holding that state court's failure to suppress physical fruits of Miranda violation was not an unreasonable application of clearly established federal law because of "disagreement and confusion" among courts regarding application of Dickerson). The First Circuit, by contrast, has ruled that the physical fruits of a Miranda violation must be suppressed in certain circumstances, depending on the need for deterrence of police misconduct in light of the circumstances of each case. United States v. Faulkingham, 295 F.3d 85, 90-94 (1st Cir. 2002). Below, we analyze the merits of each of these approaches. We conclude that the First Circuit is correct that the physical fruits of a Miranda violation must be suppressed where necessary to serve Miranda's deterrent purpose. However, we part company with the First Circuit in the application of that standard, because we conclude that

- 22 -

*Miranda*'s deterrent purpose requires suppression of the physical fruits of a negligent *Miranda* violation. We therefore conclude that suppression of the gun in the present case was appropriate.

### 1. *Sterling & DeSumma*

The Third and Fourth Circuits have concluded that the fruits doctrine simply does not apply to *Miranda* violations even after *Dickerson*. United States v. Sterling, 283 F.3d 216, 218-19 (4th Cir. 2002), cert. denied, 122 S. Ct. 2606 (2002); United States v. DeSumma, 272 F.3d 176, 180-81 (3d Cir. 2001), cert. denied, 122 S. Ct. 1631 (2002). Both of these cases held that the physical fruits of a *Miranda* violation were admissible. Sterling, 283 F.3d at 219 (shotgun found in vehicle as a result of *Miranda* violation); DeSumma, 272 F.3d at 180-81 (gun found in vehicle as a direct result of *Miranda* violation). Both Sterling and DeSumma relied on substantially the same reasoning, focusing primarily on an isolated passage in Dickerson. Dickerson noted at the outset of the opinion that "*Miranda* and its progeny in this Court govern the admissibility of statements made during custodial interrogation in both state and federal courts." 530 U.S. at 432. Later in the opinion, in the course of rejecting various arguments supporting the erroneous view that *Miranda* was not a constitutional decision, the Court stated:

> The Court of Appeals also noted that in Oregon v. Elstad we stated that "[t]he *Miranda* exclusionary rule . . . serves the

- 23 -

Fifth Amendment and sweeps more broadly than the Fifth Amendment itself." Our decision in that case – refusing to apply the traditional "fruits" doctrine developed in Fourth Amendment cases – does not prove that <u>Miranda</u> is a nonconstitutional decision, but simply recognizes the fact that unreasonable searches under the Fourth Amendment are <u>different</u> from unwarned interrogation under the Fifth Amendment.

<u>Dickerson</u>, 530 U.S. at 441 (emphasis added, citations and internal quotations omitted).

Both <u>Sterling</u> and <u>DeSumma</u> viewed this language as amounting to an endorsement of the rule that the <u>Wong Sun</u> exclusionary rule does not apply to the physical fruits of a <u>Miranda</u> violation. <u>Sterling</u>, 283 F.3d at 219; <u>DeSumma</u>, 272 F.3d at 180. <u>Sterling</u> explained:

> Although <u>Dickerson</u> held <u>Miranda</u> to be with Constitutional significance, <u>Miranda</u> only held that certain warnings must be given before a suspect's <u>statements</u> made during custodial interrogation can be admitted into evidence. In addition, we are of opinion that the Court's reference to and reaffirmation of <u>Miranda</u>'s progeny indicates that the established exceptions, like those in <u>Tucker</u> and <u>Elstad</u>, survive. Thus, the distinction between statements and derivative evidence survives <u>Dickerson</u>. In fact, <u>Dickerson</u> reiterated the distinction made in <u>Elstad</u> by stating that: "Our decision in that case – refusing to apply the traditional 'fruits' doctrine developed in Fourth Amendment cases – does not prove that <u>Miranda</u> is a nonconstitutional decision, but simply recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment."

283 F.3d at 219 (emphasis in original, citation omitted).

- 24 -

There are at least two serious problems with the reasoning in DeSumma and Sterling. First, we respectfully disagree with their conclusion that Dickerson's reference to the controlling force of "Miranda and its progeny in this Court" forecloses the argument that the physical fruits of a Miranda violation may be suppressed. Although we agree that, based on this language, the holdings of Elstad and Tucker survive Dickerson, neither Elstad nor Tucker involved the physical fruits of a Miranda violation; as explained above, Elstad expressly contrasted the subsequent confession it found admissible from physical fruits, while Tucker expressly limited its holding to pre-Miranda interrogations. See Patterson, 485 U.S. at 922-24 (White, J., dissenting from denial of certiorari). By wholly undermining the doctrinal foundation upon which those holdings were built, Dickerson effectively left Elstad and Tucker standing but prevented lower courts from extending their holdings. Of course, prior to Dickerson many lower courts (including this one) already had expanded the holdings of Elstad and Tucker by concluding that Miranda violations do not require suppression of physical fruits, but Dickerson explicitly limited its saving language to Miranda's "progeny in this Court." 530 U.S. at 432 (emphasis added). Far from endorsing pre-Dickerson lower court case law, then, Dickerson instead signaled the contrary view.

The second fundamental problem with the reasoning in <u>DeSumma</u> and <u>Sterling</u> is that the language that they rely on for the proposition that <u>Dickerson</u> endorsed the extension of <u>Elstad</u> to physical fruits in fact said only that <u>Elstad</u> "recognizes . . . that unreasonable searches under the Fourth Amendment are <u>different</u> from unwarned interrogation under the Fifth Amendment." <u>Dickerson</u>, 530 U.S. at 441 (emphasis added). The critical question, of course, is <u>how</u> the two are different. At oral argument in the present case, the Government argued only that the way that Fourth Amendment violations differ from Fifth Amendment violations is that the <u>Wong Sun</u> fruits doctrine applies to the former and not the latter. This argument already has been rejected by the Supreme Court. <u>Nix v. Williams</u>, 467 U.S. 431, 442 & n.3 (1984) (noting that the Court has applied the fruits doctrine to violations of the Fifth Amendment, citing <u>Murphy v. Waterfront Comm'n</u>, 378 U.S. 52, 79 (1964)); <u>Kastigar v. United States</u>, 406 U.S. 441, 460-61 (1972). Although <u>Dickerson</u> itself does not explain how searches under the Fourth Amendment are "different," <u>Elstad</u> does just that: "a procedural <u>Miranda</u> violation differs in significant respects from violations of the Fourth Amendment, which have traditionally mandated a <u>broad</u> application of the 'fruits' doctrine." 470 U.S. at 306 (emphasis added).[7] This language indicates that <u>Miranda</u>

---

[7] <u>Elstad</u> also stated that a second way that Fourth Amendment violations are different from <u>Miranda</u> violations is that only the former are constitutional

(continued...)

violations are "different" because a <u>narrowed</u> application of the fruits doctrine applies to <u>Miranda</u> violations, not because the fruits doctrine does not apply at all. <u>Cf. id.</u> at 306 (referring to "[t]he <u>Miranda</u> exclusionary rule").

Of course, <u>Elstad</u>'s explanation of how application of the fruits doctrine is "different" in <u>Miranda</u> cases begs the question of what a "broad" application means. We conclude that the broad application of the fruits doctrine is that defined in <u>Nix</u>: "the prosecution is not to be put in a better position than it would have been in if no illegality had transpired." 467 U.S. at 443. Application of the fruits doctrine in the <u>Miranda</u> context is not "broad" because a number of exceptions to this pure rule have been recognized, circumstances where the prosecution is permitted to benefit from the <u>Miranda</u> violation. <u>See Elstad</u>, 470 U.S. at 314; <u>Tucker</u>, 417 U.S. at 447-48; <u>New York v. Quarles</u>, 467 U.S. 649, 657 (1984) (unwarned answers "to questions in a situation posing a threat to the public safety" may be used); <u>Harris v. New York</u>, 401 U.S. 222, 225-26 & n.2 (1971) (unwarned statements may be used for impeachment on cross-examination).

One could argue that further narrowing of the pure fruits doctrine in the <u>Miranda</u> context – narrowing beyond that already effectuated by the holdings of

---

[7](...continued)
violations. 470 U.S. at 305-07. This difference, of course, is one that <u>Dickerson</u> itself rejects.

Elstad and Tucker[8] – also is appropriate. However, we are unpersuaded that the

additional narrowing articulated in DeSumma and Sterling (refusing to apply the

fruits exclusion to physical evidence obtained as a result of the illegally obtained

confession) reflects a correct understanding of the way in which Miranda

violations are, in Dickerson's words, "different" from Fourth Amendment

violations.

A blanket rule barring application of the fruits doctrine to the physical

fruits of a Miranda violation would mark a dramatic departure from Supreme

Court precedent. The Court consistently has recognized that deterrence of police

misconduct, whether deliberate or negligent, is the fundamental justification for

the fruits doctrine. Nix, 467 U.S. at 442-43 ("The core rationale consistently

advanced by this Court for extending the exclusionary rule to evidence that is the

fruit of unlawful police conduct has been that this admittedly drastic and socially

costly course is needed to deter police from violations of constitutional and

statutory protections."); see also Elstad, 470 U.S. at 308 (identifying

trustworthiness and deterrence as the two rationales for a broad fruits suppression

rule); Tucker, 417 U.S. at 447 (noting "the deterrent purpose of the exclusionary

---

[8] Tucker's narrowing would seem no longer applicable because it appeared to establish an exception only for questioning that pre-dated Miranda itself. Elstad's narrowing would still have applicability today because it declined to apply the fruits exclusion to a subsequent voluntary confession rendered after the Miranda warnings are given.

rule"). The Court also has been consistent in narrowing the scope of the fruits doctrine in the <u>Miranda</u> context only where deterrence is not meaningfully implicated. See <u>Elstad</u>, 470 U.S. at 308-09 (stating that admission of voluntary post-warning statements will not undercut deterrence because the suspect remains "free to exercise his own volition in deciding whether or not to make a [post-warning] statement to the authorities"); <u>Tucker</u>, 417 U.S. at 447-48 (explaining that the "deterrence rationale loses much of its force" in that case because the unwarned interrogation occurred prior to <u>Miranda</u>'s issuance).

In sharp contrast with <u>Elstad</u> and <u>Tucker</u>, however, the rule argued for by the Government here risks the evisceration of the deterrence provided by the fruits doctrine, as this case well illustrates. As a practical matter, the inability to offer Patane's statements in this case affords no deterrence, because the ability to offer the physical evidence (the gun) renders the statements superfluous to conviction. See generally <u>United States v. Kruger</u>, 151 F. Supp. 2d 86, 101-02 (D. Me. 2001) ("The exclusion of the cocaine, the substance – indeed essence – of the suppressed statements, is necessary to deter law enforcement officers from foregoing the administration of <u>Miranda</u> warnings . . . ."), <u>overruled by</u> <u>Faulkingham</u>, 295 F.3d at 92-94; Yale Kamisar, <u>On the "Fruits" of Miranda Violations, Coerced Confessions, and Compelled Testimony</u>, 93 <u>Mich. L. Rev.</u> 929, 933 (1995) ("Unless the courts bar the use of the often-valuable evidence

derived from an inadmissible confession, as well as the confession itself, there will remain a strong incentive to resort to forbidden interrogation methods."); David A. Wollin, Policing the Police: Should Miranda Violations Bear Fruit?, 53 Ohio St. L.J. 805, 843-48 (1992) ("Police officers seeking physical evidence are not likely to view the loss of an unwarned confession as particularly great when weighed against the opportunity to recover highly probative nontestimonial evidence, such as a murder weapon or narcotics."). The present case is hardly anomalous in this respect, as demonstrated by the multitude of reported cases where the record demonstrated that the interrogating authorities intentionally (and in some cases pursuant to official policy and training) violated a suspect's Miranda rights in order to procure derivative evidence. E.g., United States v. Orso, 234 F.3d 436, 441 (9th Cir. 2000), aff'd in part, rev'd in part, 266 F.3d 1030 (9th Cir. 2001) (en banc); Henry v. Kernan, 197 F.3d 1021, 1026, 1028 (9th Cir. 1999); Pope v. Zenon, 69 F.3d 1018, 1023-24 (9th Cir. 1996), overruled by Orso, 266 F.3d 1030; Cooper v. Dupnik, 963 F.2d 1220, 1224-27 (9th Cir. 1992); United States v. Carter, 884 F.2d 368, 373 (8th Cir. 1989); United States v. Esquilin, 42 F. Supp. 2d 20, 33 (D. Me. 1999), aff'd, 208 F.3d 315 (1st Cir. 2000).

Further, the rule urged upon us by the Government appears to make little sense as a matter of policy. From a practical perspective, we see little difference

between the confessional statement "The Glock is in my bedroom on a shelf," which even the Government concedes is clearly excluded under <u>Miranda</u> and <u>Wong Sun</u>, and the Government's introduction of the Glock found in the defendant's bedroom on the shelf as a result of his unconstitutionally obtained confession. If anything, to adopt the Government's rule would allow it to make <u>greater</u> use of the confession than merely introducing the words themselves.

Accordingly, we decline to adopt the position of the Third and Fourth Circuits that the <u>Wong Sun</u> fruits doctrine never applies to <u>Miranda</u> violations.

### 2. *Faulkingham*

With its recent decision in <u>United States v. Faulkingham</u>, 295 F.3d 85 (1st Cir. 2002), the First Circuit rejected the Third and Fourth Circuits' blanket refusal to apply <u>Wong Sun</u> suppression to the fruits of a <u>Miranda</u> violation. <u>Id.</u> at 90-91. <u>Faulkingham</u> acknowledged, contrary to <u>Sterling</u> and <u>DeSumma</u>, that <u>Dickerson</u>'s recognition that <u>Miranda</u> violations are constitutional violations strengthened the argument that their physical fruits must be suppressed. <u>Id.</u> at 92-93. However, <u>Faulkingham</u> concluded that suppression of the fruits of a <u>Miranda</u> violation was not required in every case. Rather, it adopted a rule mandating suppression of the fruits of a <u>Miranda</u> violation in individual cases where "a strong need for deterrence" outweighs the reliability of that evidence. <u>Id.</u> at 93. Because the

- 31 -

physical fruits of a <u>Miranda</u> violation generally will be trustworthy evidence, it appears that in most cases the First Circuit's analysis boils down to a rule excluding the fruits of a <u>Miranda</u> violation only when there is a "strong need for deterrence." On each of <u>Faulkingham</u>'s two basic points – that <u>Dickerson</u> alters the analysis regarding suppression of the fruits of a <u>Miranda</u> violation, and that suppression of the physical fruits is required where necessary to effectuate <u>Miranda</u>'s deterrent purpose – we agree with the First Circuit. For reasons already stated above, we conclude that each of these propositions is compelled by Supreme Court precedent.

Turning to the application of this standard to circumstances – present both in <u>Faulkingham</u> and in the present case – where an officer negligently rather than intentionally violates a defendant's <u>Miranda</u> rights, however, we disagree with the First Circuit. In <u>Faulkingham</u>, the court concluded that, where the <u>Miranda</u> violation resulted from mere negligence on the part of the interrogating officer, there is no strong need for deterrence and thus the physical fruits of the <u>Miranda</u> violation need not be excluded. We conclude that <u>Faulkingham</u>'s cramped view of deterrence leads it to an erroneous conclusion regarding negligent <u>Miranda</u> violations.

<u>Faulkingham</u> asserted, without elaboration, that "[o]nce the un-<u>Mirandized</u> inculpatory statements of the defendant are themselves suppressed, the role of

deterrence under the Fifth Amendment becomes less primary." Id. at 92. The

heart of the court's analysis is the following:

> Where, as here, negligence is the reason that the police failed
> to give a Miranda warning, the role of deterrence is weaker
> than in a case . . . where the apparent reason the police failed
> to give a warning was their intention to manipulate the
> defendant into giving them information.
>     Faulkingham's claim, taking all the surrounding
> circumstances into account, simply does not tip the balance
> toward a strong need for deterrence. Faulkingham's statement
> was not the result of "coercive official tactics." There was no
> deliberate misconduct by the [police] agents here. There was
> no misleading or manipulation by the government . . . . The
> findings of the magistrate judge and the trial judge give us no
> reason to think that the agents deliberately failed to give the
> warning in order to get to the physical evidence or that they
> did so to get to another witness who might or might not
> incriminate Faulkingham. The agents' negligence resulted in
> the suppression of Faulkingham's confession, itself a detriment
> to the agents . . . .

Id. at 93-94 (citation to opinion below omitted). The court noted that

"Faulkingham himself started talking without much questioning" and observed

that "there is nothing to shock the conscience of the court and no fundamental

unfairness." Id. at 94. In light of the totality of the circumstances, the court held

"that Faulkingham's far weaker argument for recognition of a deterrence interest

for suppression of derivative evidence arising from a negligent violation of his

Miranda rights is insufficient to carry the day." Id.

    We do not believe that "the role of deterrence . . . becomes less primary"

once the statement itself has been suppressed. Id. at 92. Instead, the relevant

question remains whether suppression of the statement alone provides deterrence sufficient to protect citizens' constitutional privilege against self-incrimination. As we already have stated above, see supra at 29-31, we answer this question in the negative.

Nor do we share Faulkingham's view that there is a strong need for deterrence only where the officer's actions were deliberate rather than negligent. Finally, Miranda itself made clear that the privilege against self-incrimination was animated, not by a desire merely to deter intentional misconduct by police, but by the "one overriding thought" that "the constitutional foundation underlying the privilege is the respect a government . . . must accord to the dignity and integrity of its citizens." Miranda, 384 U.S. at 460; see also id. ("[T]he privilege has come rightfully to be recognized in part as an individual's substantive right . . . to a private enclave where he may lead a private life." (internal quotation marks omitted)). The personal right to be free of government invasions of the privilege against self-incrimination is violated just as surely by a negligent failure to administer Miranda warnings as a deliberate failure. Deterrence is necessary not merely to deter intentional wrongdoing, but also to ensure that officers diligently (non-negligently) protect – and properly are trained to protect – the constitutional rights of citizens. The call for deterrence may be somewhat less urgent where

negligence rather than intentional wrongdoing is at issue, but in either case we conclude that the need is a strong one.

Moreover, we conclude that a rule limiting Wong Sun suppression of the physical fruits of a Miranda violation to situations where the police demonstrably acted in intentional bad faith would fail to vindicate the exclusionary rule's deterrent purpose. Even in cases where the failure to administer Miranda warnings was calculated, obtaining evidence of such deliberate violations of Miranda often would be difficult or impossible. Cf. Whren v. United States, 517 U.S. 806, 814 (1996) (noting that one reason for the Court's adoption of an objective test for the reasonableness of a seizure was "the evidentiary difficulty of establishing subjective intent" of officers). An exclusionary rule turning on the subjective motivation of the police officer would burden courts with the difficult task of discerning, from the particular facts of each case, the thought processes of the officer that resulted in the Miranda violation. See Carter, 884 F.2d at 374 (reasoning that courts should not "once again be embroiled in the endless case-by-case voluntariness inquiries Miranda was designed to prevent [because] the ease-of-application rationale enunciated by the Supreme Court will be largely nullified"). We believe a rule that provides certainty in application and clarity for the officers charged with operating under it better serves the interests of citizens, officers, and judicial efficiency.

Accordingly, we agree with the First Circuit's conclusion that the <u>Wong Sun</u> fruits doctrine may apply to the physical fruits of <u>Miranda</u> violations, but we decline to adopt <u>Faulkingham</u>'s view that the physical fruits of a negligent <u>Miranda</u> violation are admissible. As a practical matter, we agree with the view of the United States District Court for the District of Maine, expressed in an opinion issued prior to <u>Faulkingham</u>:

> Prior to the decision in <u>Dickerson</u>, the issue of suppression of evidence discovered as a result of a violation of <u>Miranda</u> turned on a complex and largely opaque analysis attempting to resolve on an ad hoc basis the tension between the reliability of the subject evidence and the goal of deterrence of police misconduct. This Court believes all of that has gone by the board with the conferral by <u>Dickerson</u> of constitutional status on the right to a Miranda warning.

<u>United States v. Kruger</u>, 151 F. Supp. 2d 86, 101-02 (D. Me. 2001) (citations omitted), <u>overruled by</u> <u>Faulkingham</u>, 295 F.3d at 90-94.

As explained above, we conclude that <u>Miranda</u>'s deterrent purpose would not be vindicated meaningfully by suppression only of Patane's statement. We hold that the physical fruits of this <u>Miranda</u> violation must be suppressed.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's order suppressing the gun.[9]

---

[9] Defendant-Appellee's Motion to Clarify Statements Made in Defendant-Appellee's Previously-Filed Answer Brief is denied as moot.