**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 21, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

DEIRDRE COONES, as Executor of the Estate of Olin Coones,

　　　Plaintiff - Appellee,

v.

BOARD OF COUNTY COMMISSIONERS OF THE UNIFIED GOVERNMENT OF WYANDOTTE COUNTY/KANSAS CITY, KANSAS; UNIFIED GOVERNMENT OF WYANDOTTE COUNTY/KANSAS CITY, KANSAS; WILLIAM MICHAEL; ANGELA GARRISON; BRYAN BLOCK; SUSAN BROWN,

　　　Defendants - Appellants.

No. 24-3147

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:22-CV-02447-JAR)**

_____

David R. Cooper (Charles E. Branson with him on the briefs), Fisher, Patterson, Sayler & Smith, LLP, Topeka, Kansas, for Defendants-Appellants.

Russell Ainsworth, Loevy & Loevy, Chicago, Illinois, for Plaintiff-Appellee.

_____

Before **TYMKOVICH**, **PHILLIPS**, and **McHUGH**, Circuit Judges.

_____

**McHUGH**, Circuit Judge.

_____

In 2009, Olin "Pete" Coones was convicted of murdering Kathleen Schroll and acquitted of murdering Kathleen's husband, Carl Schroll.[1] After twelve years in prison, Mr. Coones was exonerated based on evidence that Kathleen had killed both herself and her husband, framing Mr. Coones for their deaths.

Mr. Coones died shortly after his release from prison. Plaintiff-Appellee Deirdre Coones, Mr. Coones's widow and the executor of his estate ("the Estate"), subsequently filed this lawsuit under 42 U.S.C. § 1983, alleging that several aspects of the police investigation into the Schrolls' deaths violated Mr. Coones's constitutional rights.

This interlocutory appeal involves claims against the two lead investigators in the Schroll death investigation, Detectives William Michael and Angela Garrison (collectively, "the Detectives"). The Detectives appeal from the district court's holding on summary judgment that they are not entitled to qualified immunity on two counts of the Estate's complaint: Count I, which alleged a due process violation based on the Detectives' alleged fabrication and suppression of evidence; and Count II, which alleged malicious prosecution.

The Detectives' employer, the Unified Government of Wyandotte County and Kansas City, Kansas ("the Unified Government"), conditionally appeals the district court's denial of summary judgment on the Estate's municipal liability claims,

---

[1] Because the Schrolls have the same last name, this opinion uses their first names to differentiate between them. Other individuals with shared last names are also generally referred to by their first names to better differentiate between them.

arguing that it is entitled to relief because the Estate's claims against the Unified Government are premised on the Detectives' allegedly unconstitutional actions and a reasonable jury could not find that the Detectives violated Mr. Coones's constitutional rights.

We affirm the district court's denial of qualified immunity. To the extent the Detectives' arguments are properly before us in this interlocutory appeal, they fail on the merits. And because we affirm the district court's decision on the merits of the Estate's claims against the Detectives, we dismiss the Unified Government's pendent appeal for lack of appellate jurisdiction.

## I.    BACKGROUND[2]

Mr. Coones was a retired mail carrier who lived with his wife and children in Kansas City, Kansas. At the time of the Schrolls' deaths in April 2008, he was fifty years old.[3]

---

[2] As elaborated on in Part II of this opinion, our review in an interlocutory appeal from the denial of qualified immunity must be based on "[t]hose facts explicitly found by the district court, combined with those that it likely assumed." *Fogarty v. Gallegos*, 523 F.3d 1147, 1154 (10th Cir. 2008). The following description of the facts is therefore taken almost entirely from the facts outlined in the district court's Memorandum and Order.

[3] Although the district court did not discuss Mr. Coones's physical condition in its Memorandum and Order, the evidence in the record indicates that Mr. Coones retired from the postal service for health reasons, having suffered from two heart attacks and a stroke. When he was taken into custody on the day of the Schrolls' deaths, he was in very poor physical health and could not even walk across a room without becoming red and winded.

At some point before 2004, Kathleen Schroll began working as a housekeeper for Mr. Coones's elderly relative,[4] Olin Coones ("Senior"),[5] and Senior's daughter Patsy. Patsy reported her gun stolen while she was living with Senior. Kathleen was later known to carry a gun in her purse that she referred to as "Pat's gun." App. Vol. XIV at 3805.

Before Senior passed away in 2007, Senior and Mr. Coones reported to the police that they suspected Kathleen was committing elder abuse of Senior. Detective Bryan Block, who worked on financial crimes, investigated Kathleen and found that she had used Senior's credit card to buy women's shoes and purses and to pay her own bills. Detective Block further discovered that Kathleen had written herself a check for her birthday from Senior's bank account "for something like $1,000." *Id.* at 3806. Moreover, she had converted Senior's vehicle to her own ownership.

When Senior died, Kathleen and Mr. Coones became involved in litigation over Senior's life insurance proceeds.

As part of his investigation into the alleged elder abuse, Detective Block sent copies of 120 checks issued from Senior's account to an expert document examiner at

---

[4] The parties' briefs describe the elder Olin Coones as Mr. Coones's father, but the pretrial order stipulates that he was Mr. Coones's grandfather, and the district court relied on this stipulation in its statement of the facts. The exact nature of their relationship is unimportant to the issues in this appeal; the point remains that Kathleen was a housekeeper for Mr. Coones's elderly relative.

[5] Following the naming conventions used by the district court and the parties, this opinion refers to the elder Olin Coones as "Senior."

the Kansas Bureau of Investigation ("KBI"). The document examiner issued a report on July 27, 2007. In this report, which identified Kathleen as a suspect, "the examiner found 'strong indications' that all but three of the 120 checks submitted for review may not have been authored by Senior, although due to the poor quality of the copies sent for evaluation, 'he could not be eliminated as the author.'" *Id.* at 3815.

Before her death, Kathleen made several statements about Mr. Coones to her mother and other family members. She told them that Mr. Coones had been stalking and harassing her, that she suspected he had burglarized her home, and that she had reported this conduct to the police on numerous occasions. However, the police department had no record of Kathleen ever contacting them about Mr. Coones.

At approximately 2:20 a.m. on April 7, 2008, Kathleen called her mother, Elizabeth Horton, "and told her that 'Pete' was there trying to kill her husband . . . , that he said he was going to kill her, and that he had covered his tracks so they would not know it was him." *Id.* at 3802. "The line then went dead." *Id.* Ms. Horton's son called 911 and reported that Mr. Coones was at the Schrolls' house trying to kill Kathleen and Carl.

When police officers arrived at the Schrolls' house, the front screen door was shut but the interior door was ajar. The officers entered the house and found Kathleen's body in the living room, with a silver revolver near her left foot and a cordless phone near her right foot. She had sustained a single gunshot wound to the back of her head. "Carl's body [was] in a bedroom, sprawled across the bed with gunshot wounds to his left chest and left abdomen and an injury to his head." *Id.*

5

A pillow near his head had a bullet hole going through it. The house contained no signs of a struggle or forced entry.

Detectives Michael and Garrison, the lead detectives on the case, were called to the scene at approximately 3:15 a.m. Ms. Horton later arrived and told the Detectives about the phone call she had received from Kathleen before her death. She also told the Detectives that "Pete" was Mr. Coones, and she explained that Mr. Coones was contesting Kathleen's claim to benefits under Senior's life insurance policy. She further told them that Kathleen had filed numerous police reports against Mr. Coones for harassment and stalking.

While the Detectives interviewed witnesses, a police sergeant on the scene "radioed to dispatch and reported that the deaths appeared to be a 'possible murder-suicide.'" *Id.* at 3803.

The Detectives asked Kathleen's brother to accompany them to Mr. Coones's home. The brother gave them Mr. Coones's address and told them that Mr. Coones drove a brown van. The Detectives stopped their vehicle halfway down Mr. Coones's street, and Detective Michael walked the rest of the way to Mr. Coones's house. Detective Michael ran the vehicle tags for the only two vehicles he saw in the driveway, but neither was registered to Mr. Coones. Detective Michael could not see around the entire west side of the house from where he was standing. "He did not document or photograph his vantage point, despite admitting later that he should have done so." *Id.* at 3804. Seeing no brown van at the residence, the Detectives returned to the crime scene.

At approximately 6:35 a.m., the Detectives interviewed Kathleen's daughter, Blair Hadley. Ms. Hadley reported that Kathleen said she had been threatened by Mr. Coones at a QuikTrip gas station on April 5, 2008, as Kathleen was walking out of the QuikTrip and Mr. Coones was walking in. Specifically, during this encounter Mr. Coones allegedly told Kathleen: "You're not going to be spending my dad's money no more, bitch." *Id.*

Shortly after the Detectives spoke with Ms. Hadley, police received information that Mr. Coones was in his brown van, preparing to drive away from his house. The Detectives drove to the house and arrested Mr. Coones at about 7:00 a.m. on April 7, 2008.

The Detectives then interviewed Mr. Coones's children, Melody and Ben Coones. Both children reported that their father was in the house when they went to bed before 1:00 a.m., as well as when they woke up at about 6:30 a.m. They also told the Detectives about their father's legal dispute with Kathleen. And "Ben told detectives that his father's brown van had been parked at their home and that it would have been visible from the front of the house, but not from the street." *Id.* at 3805.

The Detectives interviewed Mr. Coones at about 10:00 a.m. He provided them with details about his lawsuit against Kathleen, told them about Detective Block's investigation into Kathleen's theft from Senior's bank account, and identified the lawyers involved in his civil dispute with Kathleen. He said that Kathleen's story about the QuikTrip encounter was not true. And he told the Detectives that he had been home from 11:15 p.m. on April 6 until he left to take his children to the bus stop

7

the next morning, at which time he was arrested. He said that his van had been parked behind his house and that the police should keep investigating, because he did not do it.

The Detectives then interviewed Mr. Coones's wife, Deirdre. Deirdre told them that Mr. Coones "went to bed at about 11:30 p.m. and was home when her alarm went off at 6:15 a.m." *Id.* at 3806. She also told them that Mr. Coones's van was parked in the back of the house that night and could not have been accessed without her daughter's boyfriend's van being moved out of the way first.

The boyfriend, Ross Minks, would later testify at trial that he saw Mr. Coones exit his bedroom to use the bathroom at around 2:00 a.m., that he heard Mr. Coones using his computer until Mr. Minks fell asleep at around 2:30 or 3:00 a.m., and that Mr. Coones would have had to pass in front of him to leave the house. Mr. Minks also testified that Mr. Coones woke him up at 6:00 a.m. to get his car keys so Mr. Coones could move Mr. Minks's vehicle so he could access his own van. Mr. Minks added that he "made several attempts to talk to" the Detectives to try to explain that he "knew where Mr. Coones was the whole entire time up until [he] went to sleep," but the Detectives did not respond to his attempts to contact them and thus never interviewed him or asked him to prepare a statement. *Id.* at 3813.

Within just a few hours after the Schrolls' deaths, the police searched Mr. Coones's home and van, finding no evidence of any blood, tissue, firearms, ammunition, gunshot residue, or anything else linking Mr. Coones to the deaths. "No DNA or fingerprint evidence from Mr. Coones was found at the Schrolls' house," and

8

the revolver was later found to contain only Kathleen's DNA—located "on both the barrel and the trigger." *Id.* at 3807. Although officers on the scene swabbed the van's steering wheel and Carl's and Kathleen's hands for gunshot residue, the Detectives did not send these swabs to the KBI for testing.

On the morning of the Schrolls' deaths, Detective Garrison received an email from a deputy district attorney informing her about the prior investigation involving Mr. Coones, Senior, and Kathleen. This email detailed Detective Block's findings about Kathleen's misuse of Senior's credit and bank accounts to financially benefit herself. The case reports from the elder abuse investigation were ultimately included in the investigative file for the Schroll death investigation. However, the KBI report on the authorship of the 120 checks from Senior's account was not included in that file.

As part of their investigation into the Schrolls' deaths, the Detectives went to QuikTrip and requested surveillance footage from April 5, 2008, to attempt to verify the story Kathleen had told her daughter about Mr. Coones threatening her in the QuikTrip. An employee burned a CD copy of the surveillance footage, and the Detectives brought the CD back to the police station and viewed it.[6] They observed

---

[6] As the Detectives note, this factual determination seems to conflict somewhat with the district court's statement in another section of the Memorandum and Order that "[i]t is undisputed that detectives did not collect . . . the QuikTrip surveillance video." App. Vol. XIV at 3830. But taking the facts in the light most favorable to the Estate, as we must in an interlocutory appeal from the summary judgment denial of qualified immunity, *see Fogarty*, 523 F.3d at 1159, we credit the district court's factual determination that a jury could find that the Detectives obtained a CD copy of the surveillance footage and took it back to the police station.

that neither Mr. Coones nor Kathleen appeared at any point in the video, which showed the interior of the store. The Detectives did not document their visit to QuikTrip, their review of the surveillance footage, or their observation that the footage did not show either Kathleen or Mr. Coones present at QuikTrip on the relevant date. Moreover, the Detectives did not inventory the surveillance video, which they should have done under their normal practice.

On April 8, the day after the Schrolls' deaths, the Detectives learned that the silver revolver found at the crime scene had been stolen from Senior's daughter Patsy. The Detectives had already been informed at this point that Kathleen possessed a gun she referred to as "Pat's gun." *Id.* at 3805.

"Also on April 8, Forensic Pathologist Erik Mitchell, M.D. performed autopsies on Carl's and Kathleen's bodies." *Id.* at 3808. Before the autopsies, he was told only "that the decedents were found dead of gunshot wounds after a call had been placed by the female decedent 'to a daughter, indicating there was an assault.'" *Id.* Based on this information combined with his forensic examination, he concluded that both Carl and Kathleen died by homicide. Detective Block, who attended the autopsies, noted in his report that "[t]here was blood on [Kathleen's] face, her scrubs, and the outside of her glasses," as well as "a small amount of blood spatter on [her] left hand." *Id.* "At some point, investigators learned that . . . Kathleen w[as] left-handed." *Id.* at 3810.

On April 9, Kathleen's daughter, Ms. Hadley, told the Detectives that Kathleen kept a handgun. And on April 14, Kathleen's mother, Ms. Horton, told the Detectives

10

that Kathleen kept a pistol in her purse, which Kathleen said she carried "for work and for protection." *Id.* at 3809. Ms. Horton reported "that Kathleen often carried large sums of money from the credit union where she worked and made deposits at another location." *Id.* Finally, she told the Detectives that Kathleen said Mr. Coones had broken into the garage of her house and stolen a riding lawnmower.

On the same day they interviewed Ms. Horton, the Detectives also interviewed Kathleen's supervisor at Midwest Regional Credit Union, Thad Jones. Mr. Jones "confirmed that Kathleen owned a handgun but said he had never seen it." *Id.* And he refuted Kathleen's story to her mother that she carried a gun because of her work, explaining to the Detectives that Kathleen's job duties did not include transporting money. Mr. Jones further told the Detectives that Kathleen had embezzled more than $11,000 from the credit union. Mr. Jones had discovered this embezzlement on the day she died, and he documented his findings regarding her embezzlement in a Suspicious Activity Report prepared on April 9. Mr. Jones provided the Detectives with a copy of the Suspicious Activity Report.

However, although Detective Michael would later admit that "reasons why a person might kill themselves, including financial trouble or imminent criminal prosecution," are relevant in investigating a potential suicide, *id.* at 3804, the Detectives did not mention the embezzlement in their reports, nor did they inventory the Suspicious Activity Report. As a result of the Detectives' withholding of this information, neither the deputy district attorney nor Mr. Coones's defense attorney was aware of Kathleen's embezzlement until long after Mr. Coones was convicted.

11

The Detectives tried but failed to corroborate Kathleen's accusation that Mr. Coones stole her lawnmower. The police did not see the lawnmower when they searched Mr. Coones's home shortly after the Schrolls' deaths, and the Detectives could not find any other evidence or information to support Kathleen's story. The Detectives were also unable to corroborate the stories Kathleen had told her family about filing several police reports and calling the police numerous times about Mr. Coones. The police department had no record of any such contact or complaints. Likewise, although Kathleen had told her brother that she had a restraining order against Mr. Coones, the police department had no record that any such restraining order ever existed. And Detective Michael further "learned that Senior had not, in fact, left an inheritance to Kathleen, as she told her mother." *Id.* at 3810. "Detective Michael now admits that these inconsistencies would have been a 'red flag' to Detective Michael that Kathleen was not honest." *Id.*

Detective Michael testified at a preliminary hearing on June 27, 2008. He stated that Mr. Coones told him following his arrest that his brown van was parked behind his house during the early morning hours of April 7, 2008. Detective Michael then testified:

> I explained to him that, once I received information as far as who he was and where he lived, that I personally went to that residence and I didn't see his vehicle. He told me that he has his vehicle parked way around behind the house, to hide it from creditors that he owned [sic] money to. He feared that his vehicle may be repossessed. And I told him that when I went up to his house to try to find his vehicle, I didn't see it. I walked to the east side of his house, which would give me a view to the back yard. I—I—I will admit, if—if if there was anything that would have indicated that the vehicle was on the extreme west end of the house, I would not have been able to see it; but we

12

subsequently served a search warrant at that house, and I did see some tire marks. I went back up to the area where I initially began my walk-up; and if the van would have been anywhere near those tire marks, I—I would have seen it, regardless of the lighting conditions.

*Id.* at 3810–11.

"Based on this testimony, the prosecutor argued that Mr. Coones gave police 'an account of his whereabouts that are inconsistent with the facts the police knew.'" *Id.* at 3811.

Mr. Coones's defense attorney, Patricia Kalb, spoke to Detective Michael before trial about the alleged confrontation at QuikTrip. Detective Michael told Ms. Kalb that he "investigated it and could not find the video." *Id.* at 3812. Neither the Detectives nor anyone else informed Ms. Kalb that Kathleen had been embezzling money from her employer, Midwest Credit Union. If she had known this information, she would have presented it as part of the defense. Moreover, neither the Detectives nor anyone else told Ms. Kalb that an expert document examiner at the KBI had examined 120 checks issued from Senior's account and "found 'strong indications' that all but three of the 120 checks submitted for review may not have been authored by Senior." *Id.* at 3815. Again, if Ms. Kalb had been aware of this evidence, she would have used it in Mr. Coones's defense.

The case was first tried before a jury in January 2009. The jury found Mr. Coones guilty of murdering Kathleen and not guilty of murdering Carl. However, the trial court ordered a new trial because the prosecution had not timely disclosed a forensic examination report of Mr. Coones's computer. On retrial in December 2009,

13

Mr. Coones was again convicted of Kathleen's murder. He was "sentenced to serve at least fifty years in prison before becoming eligible for parole." *Id.* at 3812.

At both trials, Detective Michael gave testimony regarding the brown van that was "consistent with his testimony at the preliminary hearing—that he personally went to the Coones' residence after the murder, that he did not see the brown van there, and that he would have seen it if it [were there] based on where the tire ruts were located when he viewed the backyard on the morning of April 7, 2008." *Id.*

At the retrial, Ms. Kalb argued that Kathleen committed suicide. In response, the prosecutor argued: "No evidence suggests that [Kathleen] would have any motivation other than to . . . live and keep on living." *Id.* at 3814.

A decade after the first trial, in 2019, the KBI finally tested the gunshot residue swabs that had been collected shortly after the Schrolls' deaths. No gunshot residue was detected on the swabs taken from Mr. Coones's van, but there was gunshot residue on Kathleen's left hand. And in 2020, an investigator from the prosecutor's office discovered evidence that disproved a jailhouse informant's testimony from the second trial regarding a purported confession made by Mr. Coones. Further investigation also revealed information that had been missing from the Detectives' case files, such as Kathleen's embezzlement from Midwest Credit Union and the KBI report on the examination of Senior's checks. Finally, when Forensic Pathologist Mitchell was informed of key facts known to the Detectives before trial but unknown to Forensic Pathologist Mitchell—specifically, "that the gun used to kill Kathleen and Carl was Kathleen's gun[,] that there was no

14

sign of forced entry[, and] that Kathleen had been embezzling money before her death"—he stated that if he had known these facts when he conducted his forensic examination, "he would have determined that Kathleen's most likely cause of death was suicide." *Id.* at 3816.

On November 5, 2020, Mr. Coones's conviction was vacated, all charges against him were dismissed, and he was released from custody after more than twelve years of incarceration. "Mr. Coones passed away 108 days after his release, on February 21, 2021." *Id.* He "was posthumously granted a certificate of innocence, and the records of his conviction and arrest were expunged." *Id.*

The Estate then filed a complaint under 42 U.S.C. § 1983 against Defendants-Appellants Board of County Commissioners of the Unified Government of Wyandotte County and Kansas City, Kansas; the Unified Government; Detectives Michael, Garrison, and Block; and three other police officers. The complaint alleged ten claims for relief. As pertinent to this appeal, Count I alleged a due process violation based on the fabrication and suppression of evidence, and Count II alleged malicious prosecution.

Defendants filed a Motion for Summary Judgment in which they sought judgment as to all claims against all Defendants, with the individual Defendants asserting a qualified immunity defense on the claims against them. The district court granted the Motion for Summary Judgment in part and denied it in part. As relevant to this appeal, the district court denied summary judgment to Detectives Michael and Garrison on Counts I and II and denied summary judgment to the Unified

15

Government on the *Monell* claims against it. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

In this timely interlocutory appeal, the Detectives argue that the district court erred in denying them qualified immunity on Counts I and II. The Unified Government raises no independent arguments for relief, but it conditionally requests dismissal of the claims against it if we hold that the Detectives did not violate Mr. Coones's constitutional rights.

## II.    JURISDICTION

This court does not generally have jurisdiction to review orders denying summary judgment, but we have limited "interlocutory jurisdiction over denials of qualified immunity at the summary judgment stage to the extent they 'turn[] on an issue of law.'" *Fogarty v. Gallegos*, 523 F.3d 1147, 1153 (10th Cir. 2008) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)) (alterations in original); *see also Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1161 (10th Cir. 2021).

"Under this limited jurisdiction, we may review: (1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation, or (2) whether that law was clearly established at the time of the alleged violation." *Est. of Booker v. Gomez*, 745 F.3d 405, 409 (10th Cir. 2014) (internal quotation marks omitted). "At this stage, however, we are not at liberty to review a district court's factual conclusions, such as the existence of a genuine issue of material fact for a jury to decide, or that a plaintiff's evidence is sufficient to support a particular factual inference." *Fogarty*, 523 F.3d at 1154. "Thus, if a district court

concludes that a reasonable jury could find certain specified facts in favor of the plaintiff, the Supreme Court has indicated we usually must take them as true—and do so even if our own *de novo* review of the record might suggest otherwise as a matter of law." *Booker*, 745 F.3d at 409–10 (internal quotation marks omitted). Moreover, when a defendant "nominally frames [an] argument as a legal issue" but actually challenges "the facts the district court concluded a reasonable jury could infer based upon the evidence in the summary judgment record," this court "lacks jurisdiction" to consider that argument. *Fancher v. Barrietos*, 723 F.3d 1191, 1199–1200 (10th Cir. 2013).

The Unified Government's appeal invokes this court's pendent jurisdiction. We have pendent jurisdiction over a pendent appellate claim on collateral appeal if "the appellate resolution of the collateral appeal necessarily resolves the pendent claim as well." *Moore v. City of Wynnewood*, 57 F.3d 924, 930 (10th Cir. 1995). In the context of an appeal from the denial of qualified immunity, we may exercise pendent jurisdiction over a municipality's appeal if (1) the plaintiff's claim against the municipality is premised on a police officer's allegedly unconstitutional conduct, and (2) we hold that the officer did not violate the plaintiff's constitutional rights. *Lynch v. Barrett*, 703 F.3d 1153, 1163–64 (10th Cir. 2013). Accordingly, if we hold that the Detectives did not violate Mr. Coones's constitutional rights, then we may exercise pendent jurisdiction over the Unified Government's appeal. *See id.* However, if we either affirm the district court's denial of qualified immunity or reverse on other grounds, then the Unified Government's appeal will not be

17

"inextricably intertwined," *id.* at 1164, with the Detectives' appeal. If so, then the Unified Government's appeal must be dismissed for lack of subject matter jurisdiction. *See id.*

## III.   DISCUSSION

When a defendant in a § 1983 action raises the defense of qualified immunity, "the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Booker*, 745 F.3d at 411 (quotation marks omitted). "To determine whether the right was clearly established, we ask whether 'the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Id.* (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011)). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Fogarty*, 523 F.3d at 1161 (quotation marks omitted). "The plaintiff is not required to show, however, that the very act in question previously was held unlawful to establish an absence of qualified immunity." *Booker*, 745 F.3d at 411 (quotation marks and ellipsis omitted).

"Within this court's limited jurisdiction, we review the district court's denial of a summary judgment motion asserting qualified immunity de novo." *Fancher*, 723 F.3d at 1199. "We thus consider de novo the purely legal questions of (1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a

18

legal violation and (2) whether that law was clearly established at the time of the alleged violation." *Sawyers v. Norton*, 962 F.3d 1270, 1282 (10th Cir. 2020) (quotation marks and brackets omitted). As discussed above, however, because we lack jurisdiction to consider the district court's evaluation of factual sufficiency, "we usually must take . . . as true" any facts that the district court concludes a jury could find, "even if our own de novo review of the record might suggest otherwise as a matter of law." *Booker*, 745 F.3d at 409–10 (internal quotation marks omitted). Thus, "[t]he district court's factual findings and reasonable assumptions comprise the universe of facts upon which we base our legal review of whether defendants are entitled to qualified immunity." *Cox v. Glanz*, 800 F.3d 1231, 1242 (10th Cir. 2015) (internal quotation marks omitted).

The Detectives argue that they are entitled to qualified immunity on Counts I and II of the complaint. We address each in turn.

### A.    *Count I*

As defined by the pretrial order, Count I alleged that the Detectives "violated Mr. Coones's due process rights by fabricating evidence against him and suppressing exculpatory evidence, resulting in Mr. Coones's wrongful conviction and incarceration." App. Vol. I at 282. The district court construed this claim to include allegations of "withholding, failing to preserve, and fabricating evidence," and the court held that the Detectives were not entitled to qualified immunity on any of these theories of liability. App. Vol. XIV at 3822.

To address the Detectives' arguments related to Count I of the complaint, we first explain the framework the Supreme Court has established to analyze claims based on government officials' failures to provide required evidence to the defense. After explaining this framework, we consider the Detectives' argument that the district court erred in construing Count I to include a failure-to-preserve theory of liability. Because we hold that the district court did not abuse its discretion by so construing Count I, we then turn to the Detectives' argument that they are entitled to summary judgment on the merits of this theory of liability. Next, we consider the Detectives' arguments on the withholding-of-evidence theory of liability. Finally, we address the Detectives' arguments regarding Count I's allegation of evidence fabrication.

## 1.  Legal Framework

"[T]he Supreme Court has developed a framework to analyze what might loosely be called the area of constitutionally guaranteed access to evidence." *Fero v. Kerby*, 39 F.3d 1462, 1471 (10th Cir. 1994) (quoting *United States v. Femia*, 9 F.3d 990, 993 (1st Cir.1993)). This framework began with the Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83 (1963), in which "the Court pronounced the basic principle that 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Fero*, 39 F.3d at 1471–72 (quoting *Brady*, 373 U.S. at 87).

20

A *Brady* violation occurs when (1) the government—through a prosecutor, an investigator, a law enforcement officer, or some other "arm[] of the state"— suppresses evidence; (2) the evidence is favorable to the accused; and (3) the evidence is material to the defense. *Smith v. Sec. of N.M. Dep't of Corr.*, 50 F.3d 801, 824–27 (10th Cir. 1995). And civil liability for a *Brady* violation may arise when police officers or other government employees suppress favorable, material evidence either "knowingly or with reckless disregard for the truth." *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004).

This court has held that the *Brady* test does not apply to evidence that the government is unable to locate or produce. *See Fero*, 39 F.3d at 1472. When "the government no longer possesses the disputed evidence," *id.* (quotation omitted), a due process claim based on the failure to produce this evidence is governed instead by the Supreme Court's decisions in *California v. Trombetta*, 467 U.S. 479 (1984), and *Arizona v. Youngblood*, 488 U.S. 51, 54–58 (1988). "Under the two-prong *Trombetta* test, the government violates a defendant's right to due process when: (1) it [loses or] destroys evidence whose exculpatory significance is 'apparent before' [the loss or] destruction; and (2) the defendant remains unable to 'obtain comparable evidence by other reasonably available means.'" *United States v. Bohl*, 25 F.3d 904, 909–10 (10th Cir. 1994) (quoting *Trombetta*, 467 U.S. at 489); *see also id.* at 911 (explaining that this standard applies to evidence that is either lost or destroyed). In *Youngblood*, the Court "extended *Trombetta* to provide that, if the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence

21

was 'potentially useful' for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence." *Id.* at 910 (quoting *Youngblood*, 488 U.S. at 58).

The controlling legal standard for a claim brought under this broad framework may shift over the course of the proceeding. For instance, in *Fero* a piece of bloody carpet from a crime scene "could not be located by the State when the defense requested it," and it was therefore "at least initially . . . subject to the rule stated in [*Youngblood*]." 39 F.3d at 1472. However, "the carpet evidence was later discovered during the pendency of [the accused's] direct appeal," meaning that "it could be and was tested by the defense and there was no task of guessing as to its probative value." *Id.* Because the evidence was thus available to the defense at the time of the appeal, we concluded "that reliance on *Youngblood* in these circumstances is misplaced," and the "due process claim must be determined under the standard of *Brady*" instead. *Id.*

### 2.     Count I's Inclusion of a Failure-to-Preserve Theory of Liability

The Detectives argue that the district court erred in analyzing Count I in part under the *Trombetta/Youngblood* standard. According to the Detectives, the pretrial order did not include a failure-to-preserve claim, and the Estate therefore cannot proceed on a *Trombetta/Youngblood* theory of liability in this case.

"We review for abuse of discretion a trial court's decision to address or not to address an issue on the basis of a pretrial order." *Leathers v. Leathers*, 856 F.3d 729, 760 (10th Cir. 2017). "Under the abuse of discretion standard, the decision of a trial court will not be disturbed unless the appellate court has a definite and firm

22

conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Id.* (quotation marks omitted).

Although a claim or theory that is not included in the pretrial order is "usually" waived, "a pretrial order should be liberally construed to cover any of the legal or factual theories that might be embraced by its language." *Id.* (quotation marks omitted). "In particular, we have construed pretrial orders most liberally when the orders state the parties' claims in general terms." *Id.* at 760–61.

Here, the pretrial order stated the parties' claims in general terms. The statement of Count I consists in its entirety of the following description:

> Count I: Due Process Violation (fabricating and suppressing evidence), 42 U.S.C. § 1983, against Michael, Garrison, Block, Brown, Board of County Commissioners of the Unified Government of Wyandotte County and Kansas City Kansas, and the Unified Government of Wyandotte County and Kansas City Kansas. These Defendants, acting individually and in concert, violated Mr. Coones's due process rights by fabricating evidence against him and suppressing exculpatory evidence, resulting in Mr. Coones's wrongful conviction and incarceration.

App. Vol. I at 282.

The Detectives cite no authority for the proposition that a general reference to "suppressing exculpatory evidence" can be construed only as invoking the *Brady* test while waiving any reliance on the *Trombetta/Youngblood* side of the Supreme Court's framework for evaluating this type of claim. And the Detectives' argument that the pretrial order foreclosed any reliance on *Trombetta* or *Youngblood* is dramatically undermined by the fact that, after the pretrial order was issued, the Detectives devoted several pages of their Motion for Summary Judgment to arguing

that *Youngblood* governed the Estate's due process claim; indeed, the Detectives continue to argue for the application of at least part of the *Youngblood* test to the Estate's claims in this appeal. Moreover, the pretrial order's summary of the Estate's factual contentions referred not just to the withholding of evidence, but also to the failure to preserve exculpatory evidence, further supporting the idea that Count I's general claim of "suppressing exculpatory evidence," App. Vol. I at 282, can be liberally construed to include both *Brady* and *Trombetta*/*Youngblood* theories of liability. *See Leathers*, 856 F.3d at 760.

Under these circumstances, the district court's decision to address the potential application of the *Trombetta/Youngblood* test to the Estate's due process claim "d[id] not conflict with the underlying purpose served by requiring issues to be set forth in pretrial orders," which is "to avoid surprise by requiring parties to fully and fairly disclose their views as to what the real issues of the trial will be." *Id.* at 761 (internal quotation marks omitted). We therefore hold that the district court did not abuse its discretion by analyzing Count I under both the *Trombetta/Youngblood* standard and the *Brady* standard.

### 3.    Trombetta/Youngblood Standard

We turn then to the merits of the district court's application of the *Trombetta*/*Youngblood* standard to the Estate's due process claim. The Detectives' sole contention of error is that the *Trombetta*/*Youngblood* standard requires a showing of bad faith, which the Detectives argue was not satisfied here.

24

This argument misstates the governing legal standard. As explained above, "[u]nder the two-prong *Trombetta* test, the government violates a defendant's right to due process when: (1) it [loses or] destroys evidence whose exculpatory significance is 'apparent before' [the loss or] destruction; and (2) the defendant remains unable to 'obtain comparable evidence by other reasonably available means.'" *Bohl*, 25 F.3d at 909–10 (quoting *Trombetta*, 467 U.S. at 489); *see also id.* at 911 (explaining that this standard applies to both the loss and destruction of exculpatory evidence). *Youngblood* "extend[s]" this standard "to provide that, if the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was 'potentially useful' for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence." *Id.* at 910 (quoting *Youngblood*, 488 U.S. at 58). But *Youngblood* does not apply if the exculpatory value of the evidence can be determined. *See id.* And here, the district court identified specific facts that the jury could refer to in determining the exculpatory value of the QuikTrip video. The district court therefore appropriately held that *Trombetta* alone would govern any possible failure-to-preserve claim regarding the QuikTrip video.

Because the Detectives' sole argument on the merits of this claim thus fails as a matter of law, we affirm the district court's denial of qualified immunity on Count I as it relates to the Detectives' failure to preserve evidence.

### 4.    *Brady* Standard

Having established that the district court did not err in applying *Trombetta/Youngblood*, we next consider the court's application of the *Brady*

25

standard. In analyzing Count I under the *Brady* standard, the district court focused on three pieces of withheld evidence: (1) the Suspicious Activity Report and related evidence of Kathleen's embezzlement and financial distress; (2) the KBI check-forging report; and (3) the QuikTrip surveillance video. The district court concluded that a jury could find the Detectives suppressed each of these pieces of evidence because, "[v]iewing the evidence in the light most favorable to [the Estate], [Detectives Michael and Garrison] were personally responsible for completing the investigative reports, viewing and then withholding evidence of the QuikTrip video, the embezzlement evidence, and the KBI expert report." App. Vol XIV at 3833.

The district court determined that a jury could find this suppressed evidence to be both favorable and material, explaining that this evidence would have (1) supported the defense theory of murder–suicide by providing a motive for Kathleen to commit suicide, (2) corroborated the defense theory that Kathleen was stealing money from Senior, (3) supported the defense's trial argument that Kathleen had a reason to frame Mr. Coones for her murder, and (4) "tipped the scales in terms of supporting the defense theory that Kathleen had been lying to her family about Mr. Coones harassing her, and specifically lied about harassing her two days before her death." *Id.* at 3829. Based on this analysis, the court concluded there was "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Id.* at 3824 (quoting *Cone v. Bell*, 556 U.S. 449, 470 (2009)).

26

The district court further held: "[A] reasonable jury could find that these detectives' conduct went beyond mere negligence because they should have understood the importance of the evidence and yet, failed to produce it to the prosecutors or the defense." *Id.* at 3833. Because the facts thus supported a finding of "at least reckless intent," the court concluded that a jury could find the Detectives liable under § 1983 for violating Mr. Coones's constitutional due process rights. *Id.*

Turning then to the second prong of the qualified immunity analysis, the district court held that the law was clearly established at the time of the Detectives' actions in 2008, such that a reasonable officer in their position would have understood that withholding this evidence violated Mr. Coones's constitutional due process rights. *See Booker*, 745 F.3d at 411. In so holding, the district court noted that this circuit "made clear as early as 1995 that '*Brady* requirements extend to law enforcement personnel.'" App. Vol. XIV at 3829 (quoting *Bledsoe v. Carreno*, 53 F.4th 589, 613 (10th Cir. 2022) (internal quotation marks, brackets, and ellipsis omitted)).

Many of the Detectives' arguments on appeal directly or implicitly challenge the district court's evaluation of the record on summary judgment. For instance, the Detectives contend that there is no evidence they knew about the KBI check-forging report. Likewise, they contest both whether they were aware of Kathleen's embezzlement and whether a jury could find that the embezzlement evidence was material. And they further argue that the QuikTrip surveillance video was not in their

possession, and thus the district court erred in treating it as withheld evidence under *Brady* rather than unpreserved evidence under *Youngblood*.[7]

As explained above, however, we must generally accept as true any facts that the district court concludes a jury could find, "even if our own *de novo* review of the record might suggest otherwise as a matter of law." *Booker*, 745 F.3d at 409–10 (internal quotation marks omitted). And here, the district court specifically determined that a reasonable jury could find that the Detectives "were personally responsible for completing the investigative reports, viewing and then withholding evidence of the QuikTrip video, the embezzlement evidence, and the KBI expert report." App. Vol. XIV at 3833. Similarly, the district court determined that the jury could find the withheld evidence to be material, explaining how this evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 3826 (quoting *Cone*, 556 U.S. at 469–70 (in turn quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995))). With respect to the embezzlement evidence, for instance, the district court specifically determined that the jury could find this evidence to be material because it would have supported Mr. Coones's trial defense by helping to prove that (1) Kathleen had a motive to commit suicide, (2) Kathleen was stealing from her current employer and might well

---

[7] The district court in fact considered the QuikTrip video under both standards and concluded that a reasonable jury could find that the Detectives violated Mr. Coones's clearly established due process rights under either standard. For the reasons discussed in this Section of the opinion and in Section III.A.3 above, we affirm the district court's ruling under both standards.

have stolen from Senior when she worked for him, and (3) Kathleen had a motive to frame Mr. Coones for her murder.

The Detectives' arguments to the contrary ignore this court's limited jurisdiction in an interlocutory appeal from the denial of qualified immunity, impermissibly asking us "to review the district court's factual conclusions concerning the reasonable facts and inferences the evidence could support." *Vette*, 989 F.3d at 1167. But "we are not at liberty" to do so. *Fogarty*, 523 F.3d at 1154. And we are unpersuaded by the Detectives' attempt to skirt around this court's jurisdictional limitations by couching some of these arguments as legal rather than factual issues. As we have explained, we lack jurisdiction to consider an argument that is "nominally frame[d]" as a legal issue but "cannot reasonably be understood as anything other than an attack" on the district court's determinations regarding the facts and inferences supported by the summary judgment record. *Fancher*, 723 F.3d at 1199–20; *see also Vette*, 989 F.3d at 1167.

Likewise, although their next argument is rather unclear, the Detectives appear to be attempting to hide a factual dispute behind a legal façade by arguing that the district court incorrectly permitted "liability for damages under § 1983 for mere negligence," Appellants' Br. at 29, and "without a mens rea or scienter requirement, *id.* at 37. This purportedly legal argument does not seem to be based on the district court's statement of the pertinent legal standard, as the district court specifically held that the Estate's due process claim required a showing "that the officers acted 'with deliberate or reckless intent.'" App. Vol. XIV at 3869 (quoting *Johnson v. City of*

29

*Cheyenne*, 99 F.4th 1206, 1232 (10th Cir. 2024)). And the district court also referred to the correct legal standard when it applied the scienter requirement to facts of this case, holding that "[a] reasonable jury could find that these detectives' conduct went beyond mere negligence" and instead demonstrated "at least reckless intent." *Id.* at 3833.

The Detectives seem to be arguing that the district court *implicitly* allowed § 1983 liability for negligent behavior because the facts in the summary judgment record would not support a finding of knowledge or recklessness. But any such argument would necessarily be premised on a dispute over "the facts the district court concluded a reasonable jury could infer based upon the evidence in the summary judgment record," which we lack jurisdiction to consider despite the Detectives' attempts to "nominally frame[] this argument as a legal issue." *Fancher*, 723 F.3d at 1199; *see also Ralston v. Cannon*, 884 F.3d 1060, 1067–68 (10th Cir. 2018) (dismissing an interlocutory qualified immunity appeal for lack of appellate jurisdiction because the defendant only challenged the district court's factual determination that a reasonable juror could find the requisite mens rea).

Thus, to the extent the Detectives are arguing that the district court held as a matter of law that a government official can be held liable under § 1983 for mere negligence, this argument is refuted on its face by the plain language of the district court's Memorandum and Order. And to the extent the Detectives are arguing that the summary judgment record does not support the district court's determination that a

30

jury could find the requisite mental state for § 1983 liability, we lack jurisdiction over this factual dispute. *See Ralston*, 884 F.3d at 1067–68.

Ultimately, the Detectives raise only two challenges to the district court's *Brady* analysis that are properly before us in this interlocutory appeal.[8] First, they argue that *Brady* imposes a duty only on prosecutors, not on police officers. Second, they argue that, to the extent police officers have duties under *Brady*, an officer cannot be held liable for a *Brady* violation under § 1983 unless the plaintiff proves that the officer acted in bad faith by "knowingly suppress[ing] exculpatory evidence that would have proven innocence." Appellant's Br. at 34.

Both of these arguments are squarely contradicted by controlling Tenth Circuit law. This court has repeatedly "extended *Brady* obligations" to both police officers and "other personnel in the police department who are actively involved in a

---

[8] The Detectives devote a single sentence in their opening brief to asserting that Detective Garrison cannot be held liable for the suppression of evidence because she "(1) did not prepare the investigative report, (2) did not testify at the preliminary hearing, and (3) did not testify at [Mr.] Coones's trials." Appellants' Br. at 45. This argument "has not been even minimally supported by legal argument or authority," *Phillips v. Calhoun*, 956 F.2d 949, 953 (10th Cir. 1992), nor does it include the required "citations to the . . . parts of the record on which the appellant relies," Fed. R. App. P. 28(a)(8)(A). Moreover, the Detectives have failed to comply with this court's requirement to "cite the precise reference in the record where the issue was raised and ruled on." 10th Cir. R. 28.1(A). "[W]e have elsewhere declined to consider issues based on similar omissions." *United States v. Williams*, 893 F.3d 696, 701 (10th Cir. 2018).

Additionally, our review of the record reveals that the Detectives did not raise this argument before the district court. And the Detectives have not argued for plain error review on appeal, which "surely marks the end of the road for an argument for reversal not first presented to the district court." *Richison v. Ernest Grp.*, 634 F.3d 1123, 1131 (10th Cir. 2011). This argument is therefore waived, and we will not address it on appeal. *See id.*

particular investigation." *Tiscareno v. Anderson*, 639 F.3d 1016, 1022 (10th Cir. 2011), *reh'g granted, vacated in part on other grounds*, 421 F. App'x 842 (10th Cir. 2011) (unpublished); *see also, e.g.*, *Bledsoe*, 53 F.4th at 612–13 (holding that police officers violated clearly established law in 1999 by suppressing material exculpatory evidence). And the Detectives' argument that police officers cannot be held liable unless they "knowingly suppressed exculpatory evidence that would have proven innocence," Appellants' Br. at 34, is contrary to Tenth Circuit law in two different ways.

As an initial matter, it is well established that *Brady* does not require a showing that the exculpatory evidence would have conclusively proven the accused's innocence. *See, e.g.*, *Douglas v. Workman*, 560 F.3d 1156, 1173 (10th Cir. 2009) (reiterating that *Brady*'s materiality element "is not a requirement that the evidence be sufficiently strong to ensure an acquittal had it been presented at trial" (emphasis omitted)). And as for the Detectives' argument that a *Brady* claim against a police officer requires evidence of knowledge, this court has held for more than two decades that the mens rea requirement for this type of claim can be satisfied by either knowledge or "reckless disregard for the truth." *Pierce*, 359 F.3d at 1298; *see also, e.g.*, *Johnson*, 99 F.4th at 1225 (noting that liability for this type of claim requires "a mental state surpassing negligence—that is, acting at least knowingly or recklessly"); *Tiscareno*, 639 F.3d at 1023 ("[I]n a § 1983 context, [it] is clearly established . . . that an investigator must not knowingly *or recklessly* cause a *Brady* violation." (emphasis added)).

For example, this court held in *Pierce* that a police forensic chemist violated clearly established law in 1986 by concealing material exculpatory evidence, as "[n]o one could doubt that the prohibition on falsification or omission of evidence, knowingly or with reckless disregard for the truth, was firmly established as of 1986." *Pierce*, 359 F.3d at 1298. Accordingly, an officer in the chemist's position "could not have labored under any misapprehension that the knowing or reckless falsification and omission of evidence was objectively reasonable." *Id.* at 1299. And we have reiterated this mens rea requirement several times, including in our recent decision in *Bledsoe*, 53 F.4th at 612.

The Detectives make a weak attempt to distinguish *Pierce* and *Bledsoe* by arguing that those cases were decided on motions to dismiss. They do not articulate why the stage of the proceeding would alter this court's legal conclusions regarding the mens rea required to hold a police officer liable for a *Brady* violation, and we can see no logical reason for disregarding *Pierce* and *Bledsoe*'s substantive legal standard based on this procedural distinction.

The Detectives also argue that *Bledsoe* in fact supports their argument because the police officers in that case knowingly suppressed exculpatory evidence. However, the particular facts at issue in *Bledsoe* do not change the legal test applied by this court, under which the police officers could be held liable for their "falsification or omission of evidence, knowingly *or with reckless disregard for the truth*." 53 F.4th at 612 (emphasis added) (quotation marks omitted). Thus, regardless of whether the police officers in *Bledsoe* acted knowingly or recklessly, *Bledsoe*'s statement of the

33

law is consistent with this court's longstanding rule, allowing § 1983 liability for a *Brady* violation committed either knowingly or recklessly. *See id.*

In sum, all of the Detectives' arguments regarding the *Brady* test "are alternatively meritless or are ones over which we may not exercise appellate jurisdiction." *Vette*, 989 F.3d at 1168. We therefore affirm the district court's denial of qualified immunity to the Detectives on Count I under the *Brady* theory of liability.

### 5.    Fabrication of Evidence

Finally, we consider Count I's allegations of evidence fabrication. The district court held that the Detectives were not entitled to qualified immunity on the Estate's fabrication claim for two reasons. First, in light of the very sparse briefing on this claim in the Detectives' Motion for Summary Judgment, the court held that the Detectives' arguments were "insufficient to trigger invocation of qualified immunity, or otherwise move for summary judgment, on [the Estate's] fabrication claim." App. Vol. XIV at 3831. In explaining this holding, the court noted that the Detectives had not addressed the elements of this claim, nor had they even acknowledged that a fabrication claim requires a separate test from a *Brady* claim. Second, the court alternatively held that the Estate had met its "burden of coming forward with evidence creating a strong issue of fact about whether Detective Michael fabricated his testimony about the van." *Id.* at 3832.

The Detectives argue that both of the district court's reasons for denying qualified immunity on this claim were incorrect.[9] First, they argue that they adequately raised an argument regarding the fabrication claim based on three scattered statements on three different pages of their Motion for Summary Judgment. Specifically, they cite to (1) their conclusory assertion that they were "entitled to judgment on plaintiff's claim of fabrication of evidence/suppression of exculpatory evidence," App. Vol. II at 310; (2) their argument that *Bledsoe* "suggests the threshold for individual liability requires proof the defendant knowingly fabricated false evidence or knowingly suppressed exculpatory evidence that would have proven innocence," *id.* at 313 (emphasis omitted); and (3) their assertion that "[n]othing during the investigation corroborated, as fact, that [Mr.] Coones[] could not have used his van to commit the murder," *id.* at 318. Second, the Detectives argue on the

---

[9] The Detectives additionally raise a new argument on appeal, asserting for the first time that Detective Garrison cannot be found liable on a fabrication claim because she did not prepare the investigative report or testify at the preliminary hearing or trial. As with the Detectives' earlier argument regarding Detective Garrison's personal responsibility for suppressing evidence, this argument is not supported by any citations to the record. And although this argument was raised for the first time on appeal, the Detectives do not address plain error.

We conclude that this argument has been waived by the Detectives' failure to adequately brief this argument on appeal as well as by their failure to address plain error in either their opening or reply brief. *See MacArthur v. San Juan Cnty.*, 495 F.3d 1157, 1160–61 (10th Cir. 2007) ("Mere conclusory allegations with no citations to the record or any legal authority for support does not constitute adequate briefing." (internal quotation marks and brackets omitted)); *Becker v. Kroll*, 494 F.3d 904, 913 n.6 (10th Cir. 2007) ("An issue or argument insufficiently raised in the opening brief is deemed waived."); *Richison*, 634 F.3d at 1131 ("[T]he failure to argue for plain error and its application on appeal[ ]surely marks the end of the road for an argument for reversal not first presented to the district court."). We therefore decline to consider this argument.

35

merits that the facts in the summary judgment record "do[] not permit the inference that [Detective] Michael fabricated evidence" and thus "[t]he district court erred by inferring far more into [Detective] Michael's testimony than what he said." Appellants' Br. at 42–43.

We agree with the district court that the Motion for Summary Judgment's few scattered references to the fabrication claim did not adequately raise any summary judgment arguments regarding this claim. The Detectives have therefore failed to preserve any contentions regarding this claim for appellate review. *See Wall v. Astrue*, 561 F.3d 1048, 1066 (10th Cir. 2009) ("Because Claimant failed to state her theory below with the required specificity, she has failed to preserve this issue for our review." (internal quotation marks omitted)); *Harrell v. United States*, 443 F.3d 1231, 1233 (10th Cir. 2006) ("Vague, arguable references to an issue are insufficient for preservation on appeal.").

Moreover, even if the Detectives had adequately preserved a challenge to the fabrication claim, we would nevertheless lack appellate jurisdiction to consider the arguments they raise in this appeal. As the Detectives' opening brief makes clear, they are challenging the denial of qualified immunity on the fabrication claim solely on the basis that the facts in the summary judgment record "do[] not permit the inference that [Detective] Michael fabricated evidence" and thus "[t]he district court erred by inferring far more into [Detective] Michael's testimony than what he said." Appellants' Br. at 42–43. But this is clearly a challenge to "the facts the district court concluded a reasonable jury could infer based upon the evidence in the summary

36

judgment record," which this court "lacks jurisdiction" to consider. *Fancher*, 723 F.3d at 1199–1200. And although the Detectives attempt to fix this problem in their reply brief by reframing their argument as a challenge to "a legal conclusion of fabrication," Reply Br. at 10, this nominal reframing does not save their argument, which still rests on a disagreement with the district court's determination that the Estate's evidence was sufficient to support the inference that Detective Michael fabricated his testimony regarding the absence of the brown van from Mr. Coones's house on the morning of the Schrolls' deaths. *See Fancher*, 723 F.3d at 1199–1200. We therefore lack jurisdiction to consider the Detectives' argument on the merits of this claim. *See id.*

Accordingly, because all of the Detectives' challenges to the district court's ruling on Count I "are alternatively meritless or are ones over which we may not exercise appellate jurisdiction," *Vette*, 989 F.3d at 1168, we affirm the district court's denial of the Detectives' Motion for Summary Judgment on Count I of the Estate's complaint.

### B.    Count II

Count II raises a malicious prosecution claim against the Detectives. "A § 1983 malicious prosecution claim includes five elements," requiring a plaintiff to show that "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the arrest, confinement, or prosecution; (4) the defendant acted maliciously; and (5) the plaintiff sustained damages." *Shrum v. Cooke*, 60 F.4th

37

1304, 1310 (10th Cir. 2023) (emphasis omitted). If the plaintiff sufficiently establishes these elements, the plaintiff has shown a constitutional violation, thus satisfying the first prong of the qualified immunity analysis.

When the second prong of the qualified immunity analysis is at issue on appeal, we "determine whether the plaintiff's rights were clearly established, which we approach by asking whether the officers arguably had probable cause." *Felders ex rel. Smedley v. Malcolm*, 755 F.3d 870, 879 (10th Cir. 2014) (brackets and quotation marks omitted). "Arguable probable cause exists where 'a reasonable police officer in the same circumstances and . . . possessing the same knowledge as the officer in the question could have reasonably believed that probable cause existed in light of well-established law.'" *Id.* (quoting *Fleming v. Livingston Cty.*, 674 F.3d 874, 880 (7th Cir. 2012)) (emphasis omitted). The pertinent question is thus whether the conduct at issue was "objectively reasonable under existing law." *Cortez v. McCauley*, 478 F.3d 1108, 1120 (10th Cir. 2007) (en banc). And in this circuit an arrest is not "objectively reasonable under existing law"—and thus lacks "arguable probable cause"—when "the information relied on to conduct the seizure was not reasonably trustworthy information sufficient on its own to justify the seizure." *Id.* at 1120–21; *see also Irizarry v. Yehia*, 38 F.4th 1282, 1294 (10th Cir. 2022) ("[G]eneral statements of the law can clearly establish a right for qualified immunity purposes if they apply with obvious clarity to the specific conduct in question." (quotation omitted)).

On appeal, the Detectives do not discuss the first, second, or fifth elements of this circuit's malicious prosecution test, but they contend that the district court erred in concluding that the Estate could establish malice and a lack of probable cause. Additionally, they argue that they are entitled to qualified immunity on the second prong of the qualified immunity test based on the existence of at least arguable probable cause.

## 1.    Preservation

The Detectives' arguments on malice and probable cause were raised before the district court and have thus been preserved for appeal. However, the Motion for Summary Judgment did not raise any arguments regarding arguable probable cause; indeed, it was completely devoid of any reference to arguable probable cause. Although the Detectives argued that the Estate's other claims failed to show a violation of clearly established law, they did not explicitly raise a similar argument regarding the Estate's malicious prosecution claim. Instead, after arguing with respect to Count I that they did not violate Mr. Coones's clearly established *Brady* rights, they simply cited without explanation to a few cases setting forth the legal standard for probable cause, neither arguing that these cases were relevant to the malicious prosecution claim nor otherwise explaining how the cited cases would apply to their alleged conduct in this case.

Nevertheless, despite the lack of any clear argument by the Detectives on this issue, the Estate's Response in Opposition to Defendants' Motion for Summary Judgment addressed the question of clearly established law in its discussion of the

malicious prosecution claim. There, the Estate discussed the specific conduct at issue and argued that this conduct violated Mr. Coones's clearly established constitutional right to be free from malicious prosecution. The Estate supported this argument with citations to two different Tenth Circuit cases.

But the Detectives' Reply in Support of Defendants' Motion for Summary Judgment did not explain why the Estate's cases failed to put them on notice that their conduct violated Mr. Coones's right to be free from malicious prosecution, nor did the Detectives otherwise engage with the Estate's argument that their conduct violated clearly established law. Rather, the Detectives' discussion of the second prong of the qualified immunity test as it related to Count II consisted in its entirety of a conclusory sentence in which the Detectives simply asserted, with no elaboration or discussion, that they were "entitled to qualified immunity as there was unquestionably arguable probable cause." App. Vol. XIV at 3712. This bald assertion was followed by a case citation with no parenthetical or other explanation of how this case was relevant to the issues before the district court on summary judgment.

In its Memorandum and Order, the district court held that the Estate had met its burden of demonstrating a violation of clearly established law as to Count II, citing for support to one of the cases raised by the Estate in its Response in Opposition.

The Detectives' appellate challenge to that ruling consists of a single paragraph in which the Detectives recite the standard for arguable probable cause and then assert without explanation that the "facts and circumstances" here, "at a

40

minimum, gave rise to arguable probable cause." Appellants' Br. at 54–55. Although this argument is slightly more fleshed out than the single-sentence assertion in their Reply in Support, it is still undeveloped and perfunctory. And the Detectives' argument on appeal still fails to acknowledge or address the cases raised by the Estate and relied on by the district court to hold that their conduct violated clearly established law with respect to the malicious prosecution claim. Indeed, the Detectives' appellate briefing does not address the district court's reasoning on this issue at all.

"To preserve an issue for appeal, a party must alert the district court to the issue and seek a ruling—a party does not preserve an issue merely by presenting it to the district court in a vague and ambiguous manner, or by making a fleeting contention before the district court." *GeoMetWatch v. Behunin*, 38 F.4th 1183, 1206 (10th Cir. 2022) (internal quotation marks, brackets, and ellipsis omitted). Generally, we will "not address arguments raised in the [d]istrict [c]ourt in a perfunctory and underdeveloped manner." *Id.* at 1207 (internal quotation marks omitted); *see also Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011) (holding that an appellate argument was waived because it consisted in its entirety of one case citation and two conclusory sentences that failed to state the pertinent legal standard or to explain why the facts and the law supported the appellants' argument).

Although the failure to adequately raise an argument before the district court generally constitutes a forfeiture rather than waiver of that argument, the failure to "invoke[] the plain-error framework" on appeal "effectively waive[s]" a forfeited

41

argument. *GeoMetWatch Corp.*, 38 F.4th at 1206. Moreover, "[i]t is well-settled that arguments inadequately briefed in the opening brief are waived." *United States v. Cooper*, 654 F.3d 1104, 1128 (10th Cir. 2011) (internal quotation marks and brackets omitted). And because "[t]he first task of an appellant is to explain to us why the district court's decision was wrong," an appellant who "utterly fails . . . to explain what was wrong with the reasoning that the district court relied on" has waived any appellate challenge to the district court's decision. *Nixon v. City & Cty. of Denver*, 784 F.3d 1364, 1366 (10th Cir. 2015).

The Detectives did not adequately raise their arguable probable cause argument before the district court, have not argued for plain error review on appeal, and have not "explain[ed] what was wrong with the [district court's] reasoning" in their appellate briefs. *Id.* They have therefore waived appellate review of this argument. They suggest on appeal that we can overlook their waiver of this argument based on this circuit's reasoning in *Cox*, 800 F.3d at 1244–46. In *Cox*, however, we exercised our discretion to consider a forfeited qualified immunity argument based on "the unique factual and legal context of th[at] case." *Id.* at 1244. In particular, we focused in *Cox* on the plaintiff's failure to adequately brief the question of clearly established law in response to the defendant's assertion of qualified immunity. *See id.* at 1245–46. We explained that "in deciding whether it is a proper exercise of our discretion to overlook the assumed forfeiture of [the defendant] regarding the clearly-established-law question, [the plaintiff's] significant briefing shortcomings on this same question—as to which she bears the burden of proof—should be taken into

account." *Id.* at 1246. And taking those "significant briefing shortcomings" into account, we "elect[ed] to reach the merits" of the defendant's qualified immunity argument on appeal. *Id.*

*Cox* is thus distinguishable. Even assuming that its reasoning applies to an appellate argument that has been waived rather than simply forfeited, our decision to consider the forfeited issue in *Cox* was based primarily on our conclusion that the plaintiff there had "merely assert[ed] in bare-bones fashion" that the detainee in that case had a constitutional right to adequate medical care. *Id.* at 1245. Here, however, the Estate discussed the Detectives' specific conduct and cited to two different cases in support of the Estate's contention that the Detectives were on notice of the unconstitutionality of that conduct. The district court relied on this briefing, which the Detectives did not specifically address or contest, to hold that the Estate had met its burden of showing a violation of clearly established law. And the Detectives' appellate arguments still fail to engage with the cases cited by the Estate or with the district court's reasoning. Under these circumstances, we are not persuaded that it would be "a proper exercise of our discretion" to consider the Detectives' inadequately briefed and unpreserved argument on the merits of this issue. *Id.* at 1246.

We accordingly do not address this possible basis for reversing the district court's summary judgment decision. *See Abernathy v. Wandes*, 713 F.3d 538, 552 (10th Cir. 2013) ("[T]he decision regarding what issues are appropriate to entertain on appeal in instances of lack of preservation is discretionary."); *see also Cummings*

43

*v. Norton*, 393 F.3d 1186, 1190 (10th Cir. 2005) (noting that "the general rule that issues not raised below are waived on appeal" applies with particular force when the appeal arises at the summary judgment stage).

We therefore address only the Detectives' properly preserved challenges to the district court's rulings on the probable cause and malice elements of the malicious prosecution claim.

## 2.      Lack of Probable Cause

"Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *United States v. Johnson*, 43 F.4th 1100, 1107 (10th Cir. 2022) (quotation omitted). In evaluating probable cause, "the relevant question is whether a substantial probability existed that the suspect committed the crime, requiring something more than a bare suspicion." *Felders*, 755 F.3d at 879 (quotation marks omitted). "Officers must consider the totality of the evidence known to them when considering probable cause, and in cases where they have both inculpatory and exculpatory evidence they must not ignore the exculpatory evidence in order to find probable cause." *Id.* (quoting *Williams ex rel. Allen v. Cambridge Bd. of Educ.*, 370 F.3d 630, 637 (6th Cir. 2004)) (brackets omitted).

"[O]rdinarily, the statement of a victim of a crime to police may establish probable cause absent some reason to think the statement not trustworthy." *Cortez*, 478 F.3d at 1121. If the police have "reason to think the statement [is] not

trustworthy," however, then the police cannot rely on an uncorroborated victim statement to establish probable cause. *Id.* And additional scrutiny into the trustworthiness of a statement may be required where, as here, the police do not take a statement directly from the purported victim, but instead only receive a hearsay account of the victim's statements from someone "who had *no personal knowledge* of the actual facts." *Id.* at 1119.

"Reason to think [an alleged victim's] statement [is] not trustworthy" may arise in several different types of circumstances. *Id.* at 1121. In *Cortez*, for instance, this court held en banc that the police did not have probable cause to arrest an individual when the only evidence that he committed a crime was a double hearsay statement originating from a two-year-old child. *Id.* at 1122. In concluding that an uncorroborated hearsay statement from a young child was not sufficiently trustworthy to support a finding of probable cause, we cited approvingly to a Sixth Circuit case similarly holding that a "bare-bones hearsay accusation" from the mother of a three-year-old, unaccompanied by any corroborating evidence, was insufficient to establish probable cause. *Id.* at 1120 (quoting *United States v. Shaw*, 464 F.3d 615, 626 (6th Cir. 2006)). We contrasted this decision with our earlier decision in *Easton v. City of Boulder*, 776 F.2d 1441 (10th Cir. 1985), in which the non-hearsay statements of two young children to the police, combined with "ample corroborating evidence," were sufficient to give rise to probable cause. *Cortez*, 478 F.3d at 1122. We held that the prior decision in *Easton* did not compel a finding of probable cause in *Cortez* because the police in *Cortez*, unlike in *Easton*, never spoke to the alleged child

45

victim, nor did they find any evidence to corroborate the statement reportedly made by the child. *Id.* We found these distinguishing facts to be controlling. *See id.*

Notably, our holding in *Cortez* did not depend on the potential admissibility of the reported hearsay statement at trial. *Id.* at 1118. Regardless of whether an exception to the hearsay rule would have allowed the hearsay to be admitted at trial, we held that "the issue is whether the officers were justified in relying upon it alone." *Id.* And we resolved this question by holding that it "should have been patently obvious" that "unsubstantiated double-hearsay originating from a two-year-old, standing alone, does not give rise to probable cause." *Id.*

A purported victim's statements may also lack sufficient trustworthiness to establish probable cause if the declarant has a known history of dishonesty, particularly with respect to the accused, or if any facts in the record "suggest[] an ulterior motive for [the declarant's] statements." *Id.*; *see also United States v. Hall*, 113 F.3d 157, 158–59 (9th Cir. 1997) (finding no probable cause based on uncorroborated statements made by someone with a prior conviction for a crime of dishonesty, as an uncorroborated anonymous tip is not enough to establish probable cause and "[a] known liar is [even] less worthy of belief" than "an anonymous tipster").

In holding that the uncorroborated statement at issue in *Cortez* was insufficient to establish probable cause, we distinguished a previous case in which corroboration of the victim-witness's statement was held not to be "essential." *Cortez*, 478 F.3d at 1122 (citing *United States v. Patane*, 304 F.3d 1013 (10th Cir. 2002), *rev'd on*

46

*other grounds*, 542 U.S. 630 (2004)). In our prior case, the police arrested the victim's ex-boyfriend after the victim told the police that her ex-boyfriend had called her phone in violation of a domestic violence restraining order. *Patane*, 304 F.3d at 1017. We held that the police had probable cause to arrest the ex-boyfriend without the need for additional corroboration specifically because there was no evidence in the record "suggesting that [the victim] lied about the purported hang-up call out of personal animosity . . . , let alone that the police were aware of such evidence." *Id.* "For example," we explained, "there was no evidence that [the victim] had threatened to lie in such a manner, or that she had lied in such a manner in the past." *Id.* But as *Cortez* makes clear, when the police have some reason to question the reliability and trustworthiness of the purported victim's statements—for instance, when they are aware of evidence that the victim has fabricated accusations against the accused in the past—then they cannot arrest the accused unless they are able to obtain other evidence corroborating the victim's statements. *Cortez*, 478 F.3d at 1122.

Here, the only evidence potentially linking Mr. Coones to the Schrolls' deaths consisted of (1) Kathleen's daughter's hearsay report that Kathleen told her she was threatened by Mr. Coones as they walked past each other in a QuikTrip on April 5, and (2) Kathleen's mother's hearsay report that Kathleen told her in a phone call on April 7 that "Pete" was at Kathleen's house and was going to kill her and Carl. But the Detectives had "reason to think" that neither of these hearsay statements was

trustworthy, and thus these statements could not establish probable cause absent corroboration. *Id.* at 1121.

The hearsay account of Mr. Coones threatening Kathleen shortly before her death would, if trustworthy, have supported a finding of probable cause. However, when the Detectives attempted to corroborate this story, they discovered that the QuikTrip surveillance video showed that neither Kathleen nor Mr. Coones was present inside the QuikTrip on April 5. Because the surveillance video thus refuted key details of Kathleen's story to her daughter, the Detectives were aware that this hearsay account was not trustworthy and could not be relied upon to establish probable cause.

Unlike Kathleen's story to her daughter about the purported encounter in the QuikTrip, Kathleen's story to her mother about "Pete" showing up at her house to kill her and Carl was not directly refuted by evidence in the Detectives' possession. However, taking the facts in the light most favorable to the Estate, the Detectives knew that Kathleen had recently (1) fabricated a story to her daughter about Mr. Coones threatening her in a QuikTrip, (2) lied to several family members about filing police reports and calling the police about Mr. Coones, (3) lied to her brother about obtaining a restraining order against Mr. Coones, (4) lied to her mother about needing to transport large sums of money for her job, (5) lied to her mother about the reasons why she carried a firearm, (6) lied to her mother about receiving an inheritance from Senior, and (7) embezzled money from her current employer. The Detectives also knew that the evidence strongly supported Mr. Coones's position in

the civil litigation that Kathleen had exploited Senior's age and poor health to steal his money and other assets while working for him. The Detectives were thus in possession of significant evidence indicating that Kathleen had "an ulterior motive," *id.* at 1122, for fabricating a story about Mr. Coones. They were aware that Kathleen, unlike the victim in *Patane*, had repeatedly "lied in such a manner in the past." *Patane*, 304 F.3d at 1017. And they were thus on notice of the likelihood that Kathleen's story to her mother on the night of her death, like all of the other stories Kathleen told her family members about Mr. Coones, was false.

The Detectives suggest on appeal that Kathleen's phone call to her mother on the night of her death was inherently reliable as a "dying declaration." Appellants' Br. at 48. However, while a dying declaration may ordinarily be sufficient to establish probable cause even without corroboration, "only if the facts of cases do not matter[] would the expansive and incorrect interpretation put forth by the [Detectives] be plausible." *Cortez*, 478 F.3d at 1121. As the Supreme Court recognized more than a century ago, "A dying declaration by no means imports absolute verity. The history of criminal trials is replete with instances where witnesses, even in the agonies of death, have through malice, misapprehension or weakness of mind made declarations that were inconsistent with the actual facts." *Carver v. United States*, 164 U.S. 694, 697 (1897). And here, the evidence strongly suggested that Kathleen's accusation of Mr. Coones was based on malice rather than the actual facts. In light of the significant evidence of Kathleen's dishonesty, her history of fabricating stories about Mr. Coones, her motive to commit suicide, and

her motive to frame Mr. Coones for her death, the Detectives could not reasonably rely on her uncorroborated accusation of Mr. Coones, which they had "reason to think [was] not trustworthy." *Cortez*, 478 F.3d at 1121.

The Detectives also argue that they had probable cause to believe Mr. Coones murdered Kathleen based on the existence of a litigation dispute between them. However, the facts known to the Detectives indicated that Kathleen had indeed stolen from Senior as Mr. Coones alleged, and his attempt to seek a legal remedy for that theft says little about his motive to abandon a legal remedy in favor of violence, while it says a great deal about Kathleen's motive to frame him for a crime he did not commit. Moreover, even if the civil litigation did provide some weak evidence of a possible motive for Mr. Coones to murder Kathleen, this possible motive did not establish "a substantial probability," *Felders*, 755 F.3d at 879 (quotation marks omitted), that Mr. Coones was responsible for the Schrolls' deaths.

The Detectives further argue that they had probable cause to believe Mr. Coones had murdered Kathleen because "none of the people interviewed that were in [his] house on April 7 could definitively account for his whereabouts at the time of the 911 call." Appellants' Br. at 49. True, the Detectives' lack of probable cause would have been even more obvious if they had followed up on Mr. Minks's repeated attempts to tell them that he was awake until 2:30 or 3:00 a.m. and knew Mr. Coones was home "the whole entire time." App. Vol. XIV at 3813. But even as it stands, the fact that Mr. Coones's wife and children were asleep when Kathleen called her mother at 2:20 a.m. does not in any way suggest that Mr. Coones killed the

50

Schrolls. At most, this evidence would suggest that Mr. Coones might have had the opportunity to murder them. But a possible opportunity to commit a crime—combined only with an untrustworthy hearsay report from an unreliable source and weak evidence of a possible motive—is simply not enough to sustain probable cause. Of course, if Kathleen's hearsay report of Mr. Coones's presence in her house were trustworthy, then evidence suggesting he had an opportunity to commit the crime would be helpful for establishing probable cause. But Kathleen's report was not trustworthy, and there was no other evidence linking Mr. Coones to her death. Under these circumstances, his purported opportunity to kill the Schrolls cannot give rise to "a substantial probability," *Felders*, 755 F.3d at 879 (quotation marks omitted), that he murdered them. *Cf. Cortez*, 478 F.3d at 1113 n.1, 1117 (holding that the police lacked probable cause to arrest a man for suspected child sexual abuse because the only evidence tying him to the alleged crime was uncorroborated hearsay from a young child, while making no mention of the arrestee's possible opportunity, as the husband of the child's babysitter, to commit the alleged crime); *Harris v. Bornhorst*, 513 F.3d 503, 514–15 (6th Cir. 2008) (holding that the police lacked probable cause to arrest a twelve-year-old child for a five-year-old's murder where the only evidence potentially tying the twelve-year-old to the crime consisted of (1) unreliable hearsay about a threat he had allegedly made, (2) his opportunity to kill the younger child, as he "was admittedly present, shortly after [her] disappearance, in the wooded area where her body was later found"; and (3) his possible motive to kill her based on a previous incident in which she threw a brick at him).

51

The only other evidence the Detectives rely on to establish probable cause is evidence that the Schrolls died from gunshot wounds. But the fact of the Schrolls' deaths does not establish in any way that Mr. Coones was responsible for them. "An officer has probable cause to arrest if, under the totality of the circumstances, he learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed *by the person arrested*." *United States v. Munoz-Nava*, 524 F.3d 1137, 1144 (10th Cir. 2008) (emphasis added) (quotation omitted). While the evidence of the Schrolls' deaths might lead a reasonable person to believe that an offense had been committed, there was no "reasonably trustworthy information" linking Mr. Coones to any such offense.

As Detective Michael acknowledged in his deposition, the Detectives did not find a single piece of evidence to corroborate "Kath[leen]'s story, as told to her mom, that Pete was responsible for the murder of her husband and herself." App. Vol. XII at 2986. And as Detective Michael also admitted in his deposition, the numerous inconsistencies in Kathleen's other stories to her family should have been "a 'red flag' to [him] that Kathleen was not honest." *Id.* Thus, the only evidence linking Mr. Coones in any way to the Schrolls' deaths consisted of hearsay statements made by a demonstrably dishonest woman with a history of fabricating stories about Mr. Coones and a motive to frame him for a crime in retaliation for his attempts to prove her dishonesty. This untrustworthy hearsay was wholly insufficient to establish probable cause. *See Cortez*, 478 F.3d at 1116–22.

The Detectives' other appellate challenges to the district court's probable cause ruling are all based on their disagreement with the district court's specific factual determinations, which we lack jurisdiction to consider. *See Fogarty*, 523 F.3d at 1154. Accordingly, based on the facts and inferences that the district court determined a jury could find, we affirm the district court's holding that the Estate made a sufficient showing of a lack of probable cause to survive summary judgment.

## 3.    Malice

A plaintiff can establish the malice element of a malicious prosecution claim by showing that the defendant's conduct was either intentional or reckless. *See Stonecipher v. Valles*, 759 F.3d 1134, 1146 (10th Cir. 2014); *Sanchez v. Hartley*, 810 F.3d 750, 755–56 (10th Cir. 2016).

The Detectives' opening brief contains only three cursory references to the malice element of the malicious prosecution test. First, they simply state the legal standard for the malice element without applying it to the facts of this case. Second, they assert without discussion that "[t]he failure to investigate a matter fully . . . is generally considered to be token negligence at most." Appellants' Br. at 48 (quoting *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994) (internal quotation marks and emphasis omitted)). Finally, they assert that "[t]here is no evidence that [Detective] Michael or [Detective] Garrison knowingly omitted facts or acted with reckless disregard for the truth." *Id*. at 51.

Even assuming these cursory assertions are sufficient to raise an appellate challenge to the malice element of the malicious prosecution test, the Detectives have

53

not shown an entitlement to relief. Again, we lack jurisdiction to consider the Detectives' challenge to the facts the district court held a jury could find. *See Ralston*, 884 F.3d at 1067–68; *see also Wilkins v. DeReyes*, 528 F.3d 790, 801 (10th Cir. 2008), *abrogated on other grounds by Thompson v. Clark*, 596 U.S. 36 (2022) ("The district court, however, specifically found Plaintiffs had presented sufficient evidence to show the officers recklessly or intentionally coerced false statements, and we cannot review this evidentiary conclusion on appeal."). And based on the "factual findings and reasonable assumptions" made by the district court, *Cox*, 800 F.3d at 1242, the Detectives have not shown any error in the district court's legal reasoning. Their assertion regarding the legal standard for evaluating a failure to investigate, for example, is irrelevant in light of the district court's factual determination that a jury could find that they not only failed to conduct an adequate investigation but also actively suppressed exculpatory evidence and fabricated inculpatory evidence.

We accordingly affirm the district court's denial of qualified immunity to the Detectives on Count II of the Estate's complaint.

### C.    *Unified Government's Appeal*

Because we affirm the district court's denial of qualified immunity to the Detectives, our resolution of this appeal does not "necessarily resolve[]" the Unified Government's "pendent claim." *Moore*, 57 F.3d at 930. We therefore dismiss the Unified Government's appellate arguments for lack of pendent appellate jurisdiction. *See Lynch*, 703 F.3d at 1163–64.

54

## IV.   CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of qualified immunity to the Detectives on Counts I and II of the Estate's complaint. The Unified Government's portion of the appeal is DISMISSED for lack of jurisdiction.